UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

☐ **ORIGINAL**

---

TAMARA M. HARRIS
        Plaintiff,

08 CV 1703 (CBA)

**AMENDED COMPLAINT**

-against-

QUEENS COUNTY DISTRICT ATTORNEY'S OFFICE
RICHARD BROWN, ESQ. individually and as District Attorney
of Queens County, JOAN RITTER, ESQ., individually and as
Bureau Chief of the Criminal Court Bureau of the Queens District
Attorney's Office, JOHN RYAN, ESQ., individually and as Chief
Executive Assistant District Attorney, JIM QUINN, ESQ.,
individually and as Senior Executive Assistant District Attorney
LAURA HENIGMAN, ESQ., individually and as Bureau Chief of the
Intake Bureau at the Queens County District Attorney's Office, and
LIEUTENANT STEPHANIE HUNTER, individually and as
Lieutenant of the Unified Court System/Office of Court Administration

**JURY TRIAL DEMANDED**

RECEIVED
SEP - 4 2008
PRO SE OFFICE

---

    Plaintiff, TAMARA M. HARRIS, appearing pro se, for her Complaint against Defendants Queens County District Attorney's Office, Richard Brown, Esq., in his personal and official capacity, Joan Ritter, Esq., in her personal and official capacity, John Ryan, Esq., in his personal and official capacity, Jim Quinn, Esq., in his personal and official capacity, Laura Henigman, Esq., in her personal and official capacity, and Lieutenant Stephanie Hunter, in her personal and official capacity, alleges as follows:

1.    This is an action for defamation, intentional interference with prospective economic advantage, and intentional infliction of emotional distress under the laws of the State of New York, as well as an action for violations of the First, Fourth and Fourteenth Amendments of the United States Constitution, as well as Civil Rights violations under 42 U.S.C.S. Section 1983 and conspiracy to commit civil rights violations under 42 U.S.C.S. Section 1985.

## JURISDICTION AND VENUE

2.    This is an action arising under the laws of the State of New York. This court has jurisdiction over the subject matter of this action under 28 U.S.C. Section 1331, there being a federal question. Venue is proper in this District under 28 U.S.C. Section 1391(b). Notice of Intention to File a Claim against the above mentioned defendants was previously filed within 90 days of the accrual of the cause of action, pursuant to Section 10 of the Court of Claims Act and Section 50-i of the General Municipal Law.

## PARTIES

3.  Plaintiff, Tamara M. Harris, resides at 10 West 15th Street, Apt. 324, New York, NY 10011.

4.  Defendants Queens County District Attorney's Office, Richard Brown, Esq., Joan Ritter, Esq., John Ryan, Esq., Jim Quinn, Esq., and Laura Henigman maintain their principal place of business at 125-01 Queens Blvd., Kew Gardens, NY 11415. Lieutenant Stephanie Hunter, employed by the N.Y. State Unified Court System/Office of Court Administration, works at the Queens Criminal and Supreme Courthouse located at 125-01 Queens Blvd., Kew Gardens, NY 11415 and is employed by the N.Y. State Unified Court System/ Office of Court Administration, whose principal place of business is 25 Beaver Street, New York, N.Y. 10004.

## FIRST CAUSE OF ACTION- WRONGFUL TERMINATION OF EMPLOYMENT IN VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION AND 42 U.S.C.S SECTION 1983

5.  From August 9, 2005 to April 24, 2007, I was employed as an assistant district attorney at the Queens County District Attorney's Office.

6.  On or about January of 2007, the Criminal Court Bureau Chief, Joan Ritter, and the Intake Bureau Chief, Laura Henigman, learned that Bernard, the janitor at the Queens District Attorney's Office, had been working at the D.A.'s Office while infected with the contagious Tuberculosis disease.

7.  On or about January of 2007, Bernard, the janitor, was hospitalized at St. Barnabus Hospital. Joan Ritter and Laura Henigman visited him, wearing masks, so as not to contract the Tuberculosis disease.

8.  At no point in time, prior to April of 2007, did either Joan Ritter or Laura Henigman inform the prosecutors or support staff at the Queens County District Attorney's Office that Bernard had contracted the Tuberculosis disease, and that by working in the D.A.'s Borough Hall building, he had exposed both prosecutors and support staff to a highly contagious and potentially terminal disease. Although Joan Ritter and Laura Henigman alerted Richard Brown, Jim Quinn, and John Ryan to the possibility of exposure, none of these state officials warned employees at the Queens District Attorney's Office that they may have contracted Tuberculosis and should, therefore, be tested.

9.  At no point in time, immediately after discovering Bernard had exposed the entire D.A.'s Office to Tuberculosis, did Joan Ritter, Laura Henigman, Jim Quinn, John Ryan, or Richard Brown, ever notify the Department of Health of the situation. Instead, all of these state officials concealed the fact that there may have been a Tuberculosis outbreak.

10. On or about April of 2007, after being hospitalized for quite a while, the Department of Health became alerted to Bernard's condition and decided to conduct Tuberculosis tests at the Queens District Attorney's Office, to find out if any of the employees had contracted Tuberculosis.

11. On or about April 15, 2007, the Department of Health's Bureau of Tuberculosis Control conducted Tuberculosis tests in the Borough Hall Building of the Queens District Attorney's Office, located at 120-55 Queens Blvd., Kew Gardens, NY 11415.

12. On or about April 20, 2007, I learned that Assistant District Attorney, Brad Chain, who shared an office with me, had tested positive for Tuberculosis. Also testing positive for Tuberculosis, were numerous other prosecutors and support staff, whose offices were in the immediate vicinity of the office I shared with Brad Chain.

13. On or about April 20, 2007 I had a Tuberculin skin test to determine whether I also had contracted the disease. The results of the Tuberculin skin test were negative. I had not contracted Tuberculosis.

14. On or about April 20, 2007 I vocalized my concerns about working in a tuberculosis infested environment. Specifically, I confronted my supervisor, Pamela Byer and the Criminal Court Bureau Chief, Joan Ritter, about my fears of working in an office with an office-mate who had tuberculosis, in the vicinity of other employees suffering from the same disease. I was met with an angry and dismissive response by my superiors and ordered to go back to work. My supervisor curtly told me that everyone who had contracted the tuberculosis infection had had chest x-rays and that those x-rays showed that none of those infected were contagious carriers. She told me to continue working in the office with Brad Chain, despite my concerns of contracting tuberculosis.

15. On Monday, April 23, 2007, I contacted the Bureau of Tuberculosis Control, specifically Magdali Calderon, the Public Health Epidemiologist. She informed me that those who had tested positive for Tuberculosis at the Queens District Attorney's Office had not yet received chest x-rays to determine whether or not they had the active and contagious tuberculosis disease, as opposed to latent tuberculosis infection. Magdali Calderon also informed me that those who were infected were urged to take antibiotics to treat the infection, but that if they chose not to take their medicine, they would still be allowed to return to the office and work alongside non-infected prosecutors.

16. Magdali Calderon indicated that there was a possibility that, if I returned to work, I would contract tuberculosis, since there was a possibility some of those infected with tuberculosis were contagious. According to Ms. Calderon, absent a chest x-ray, it was impossible, at that point, to determine who among the infected people was contagious and who was not. Her statements to me were in direct contravention of the lies my supervisors had told me on April 20, 2007, when ordering me back to work.

17. Ms. Calderon further states that, as of the morning of April 23, 2007, there were at

least ten confirmed cases of Tuberculosis at the Queens District Attorney's Office and that the results were still coming in.

18. On or about April 23rd, 2007, subsequent to learning from the Bureau of Tuberculosis Control that my superiors at the Queens District Attorney's Office lied to me about the contagion, I contacted the press. I had hoped that exposure of the outbreak to the public would force the D.A.'s Office to take precautions against further contagion. Forcing non-infected people to continue working alongside infected people exemplified a total lack of concern, on the part of the Queens District Attorney's Office, for the health and safety of its employees. In responding to my concerns, members of the press informed me that they had contacted Joan Ritter and Laura Henigman of the Queens District Attorney's Office, and that the District Attorney's Office denied the existence of a Tuberculosis outbreak and denied that anyone working at the Queens D.A.'s Office was infected with Tuberculosis.

19. On April 24, 2007 I informed Jim Quinn, Joan Ritter, and Laura Hennigman, that I would not return to my office because Brad Chain had tuberculosis, along with roughly ten other people in the surrounding offices. I explained that I did not want to contract this disease, since I had just tested negative for the tuberculosis infection. I was given an ultimatum by the above mentioned Defendants of either going back to my desk or resigning. I refused to return to my desk, amidst contagion, and was expeditiously terminated from my job.

20. On or about April 25, 2007 I received a frivolous letter from John Ryan, Chief Assistant District Attorney, that I was being fired for incompetency and insubordination, neither of which were the true grounds for my termination.

21. The actions of John Ryan, Jim Quinn, Joan Ritter, Richard Brown, and Laura Henigman, all state employees, are in violation of my First Amendment right to speak freely about a legitimate health concern. I have a right to speak freely to my employer about my fear of working in a Tuberculosis infested office and to alert others to the existence of a Tuberculosis outbreak at the Queens District Attorney's Office, without having to suffer the consequences of a retaliatory firing by a state agency and those in it employ. Moreover, I have the right to refuse to subject myself to contagion, without having to endure a wrongful termination. Accordingly, I was engaged in protected speech and defendants took adverse action against me as a direct result of that speech.

22. Defendants Ritter, Henigman, Quinn, Ryan and Brown have violated 42 U.S.C.S. Section 1983 because said officials of the Queens District Attorney's Office are persons acting under color of statute, ordinance, regulation, custom, or usage, of this state. Such persons have caused me, a citizen of the United States, to be deprived of rights, privileges, and/or immunities secured by the Constitution and the laws. Speecifically, defendants have deprived me of my First Amendment right under the U.S. Constitution to speak freely about a public health epidemic, and such deprivation has taken place under color of state law.

23. It was not reasonable for the above named entity and officials to believe that firing me in retaliation for my exercise of my First Amendment rights was lawful.

## SECOND CAUSE OF ACTION-
## WRONGFUL TERMINATION OF EMPLOYMENT IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION (LIBERTY) AND 42 U.S.C.S SECTION 1983

24. Plaintiff realleges all of the aforementioned paragraphs.

25. I have a liberty right, under the Fourteenth Amendment of the U.S. Constitution, to work in an environment that is free of Tuberculosis and contagion. When Jim Quinn commanded me to get back to my office, joined by Joan Ritter and Laura Henigman, and then had John Ryan fire me for refusing to work in a Tuberculosis-ridden environment, these state officials violated my liberty rights under the Fourteenth Amendment. Brad Chain was infected with a potentially deadly disease and I had the right to refuse to work beside him, without being wrongfully and maliciously fired.

26. Defendants Queens District Attorney's Office, Joan Ritter, Esq., John Ryan Esq., Jim Quinn, Esq. Laura Henigman, Esq., and Richard Brown, Esq., have violated my Fourteenth Amendment liberty right, by terminating my employment in reaction to, and in retaliation of, my refusal to return to my tuberculosis infested office.

27. Defendants John Ryan, Joan Ritter, Laura Henigman, Jim Quinn, and Richard Brown are persons acting under the color of state law, under 42 U.S.C.S. Section 1983. Said defendants have violated my Fourteenth Amendment right to work in an environment free of contagion without suffering reprisals and retaliation for insisting that said defendants respect that right. Defendants' deprivation of my Fourteenth Amendment liberty right under the U.S. Constitution have taken place, by these officials, under the color of state law.

28. It was not reasonable for the above named entity and officials to believe that firing me in retaliation for the exercise of my 14th Amendment constitutional right was lawful.

## THIRD CAUSE OF ACTION-
## VIOLATION OF MY FOURTEENTH AMENDMENT LIBERTY RIGHT TO ENTER A PUBLIC COURTHOUSE AND PRACTICE MY PROFESSION, VIOLATION OF MY FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEIZURES, AND VIOLATION OF 42 U.S.C.S. SECTION 1983

29. Plaintiff realleges all of the above paragraphs.

30. On or about May 2, 2007, I attempted to enter the Queens Criminal Courthouse with Albert Dayan, Esq., who I secured a job with, and was ordered by the court officer

guarding the entrance (who I recognize by face, but am unaware of his name at this juncture), that I was to remain where I was, per the instructions of the D.A.'s Office and Lieutenant Hunter. This court officer then activated a security alert throughout the building. Immediately, multitudes of armed court officers rushed up to me and surrounded me, holding me there until Lieutenant Hunter arrived. At that point Lieutenant Hunter told Albert Dayan he could enter the building, but that I was forbidden from going inside the Queens Criminal Courthouse. She told me to stay outside the building. Thereafter, the court officer who initially activated the alert, stated to me that the D.A.'s Office had ordered that a security alert go into effect whenever I entered the building. Moreover, he told me that Lieutenant Hunter had stated that I was a "security threat", and that all court officers were to detain and surround me whenever I tried to enter the building. Additionally, Lieutenant Hunter stated to him that each time I try to enter the courthouse, the D.A.'s Office was to be notified of my presence and a security alert was to go into effect. He further informed me that the reason for the alert was that the D.A.'s Office was "pissed off" at me.

31. Upon being unjustifiably surrounded by a multitude of court officers and the security alert activated, Laura Henigman approached the area where I was being detained, and remained there until I left the building.

32. On or about May 4, 2007 I entered the Queens Criminal Courthouse and walked into courtroom AP5 to cover a case for Albert Dayan and meet a client. While inside the courtroom, and in the presence of the client, a court sergeant approached me, informed me that a security alert had been activated, and ordered me out of the courtroom. Upon exiting the courtroom I was surrounded again by a multitude of court officers, Lieutenant Hunter, and, this time, Sgt. Abruzzo of the Queens District Attorney's Office. The court officer who initially dragged me out of the courtroom pulled me aside after my removal, and apologized for his actions, stating he was only following the orders of Lieutenant Hunter, who had indicated I was a security threat.

33. Throughout the month of May, I was harassed each and every time I entered the Queens Criminal Courthouse, security alerts were activated, and I was surrounded by court officers, rendering it impossible for me to practice the profession of law by entering a public building.

34. The actions of the District Attorney's Office, through John Ryan, Jim Quinn, Joan Ritter, Laura Henigman, and Richard Brown, and the actions of Lieutenant Hunter and other court officers, violated my Fourteenth Amendment liberty right to enter a public courthouse and to practice the profession of law without being harassed, surrounded by multitudes of guards, and removed under the fiction that I am a "security threat.". Moreover, all of the above named defendants knew that I was not a security threat, including Lieutenant Stephanie Hunter, as elaborated more fully under the Fourth Cause of Action, which facts are incorporated herein and sets further sets forth how defendants' actions were unjustified.

40. The actions of the District Attorney's Office, through John Ryan, Jim Quinn, Joan Ritter, Laura Henigman, and Richard Brown and the actions of Lieutenant Hunter, and other court officers, are in contravention of my Fourth Amendment right to be free from unreasonable seizures, made applicable to the state through the Fourteenth Amendment of the United States Constitution.

41. All of the above named defendants, including Lieutenant Hunter, are persons under 42 U.S.C.S. and were acting under color of state law when they deprived me of my Fourth and Fourteenth Amendment rights under the U.S. Constitution. Defendants' conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known.

### FOURTH CAUSE OF ACTION- CONSPIRACY BY RICHARD BROWN, JOAN RITTER, JOHN RYAN, JIM QUINN, LAURA HENIGMAN, AND LIEUTENANT STEPHANIE HUNTER TO VIOLATE MY CIVIL RIGHTS PURSUANT TO 42 U.S.C.S SECTION 1983 AND 42 U.S.C.S SECTION 1985

42. Plaintiff realleges all of the aforementioned paragraphs.

43. Richard Brown, Esq., Joan Ritter, Esq., John Ryan, Esq., Jim Quinn, Esq., and Laura Henigman, Esq. were all persons acting under the color of state law; to wit; statute, ordinance, custom, regulation, or usage when they subjected me, and/or caused me to be subjected, to deprivations of my rights and privileges secured by the Constitution and laws. Specifically, my First Amendment Right to speak freely about a public health concern to the media without suffering expeditious retaliation by all of the above named defendants, my Fourth and Fourteenth Amendment right to practice the profession of my choosing, and to enter a public courthouse and public courtrooms without suffering unjustified and unreasonable seizures by defendant Hunter and court officers under her supervision. Accordingly, 42 U.S.C.S. Section 1983 makes their conduct actionable in law and equity.

44. On or about April 24, 2007, defendants Richard Brown, Esq., Joan Ritter, Esq., John Ryan, Esq., Jim Quinn, Esq., and Laura Henigman, Esq. conspired to terminate my employment, in contravention of 42 U.S.C.S. section 1985, in retaliation for my contacting the media one day earlier about a tuberculosis outbreak at the Queens District Attorney's Office.

45. The above named defendants, acting in concert, agreed to inflict an unconstitutional injury upon me; to wit, a violation of my First Amendment right to speak freely to my supervisors and the press about a tuberculosis outbreak at the Queens District Attorney's Office, and that office's failure to take precautionary measures aimed at ensuring the safety of non-infected employees.

46. Defendants Brown, Ritter, Quinn, Ryan and Henigman, terminated my employment at the Queens District Attorney's Office as a direct result of my speaking to my supervisors and the press about said tuberculosis outbreak. This constituted an overt act in furtherance of the above named defendants' goal of inflicting an unconstitutional injury upon me.

47. There was a meeting of the minds of all of the above named defendants, whereby all of them agreed and intended to contravene my U.S. Constitutional, state, and federal statutory rights, thereby causing me to sustain injury to my reputation, to lose my new job with Albert Dayan, Esq. and new source of income, and to suffer emotional pain and suffering.

48. Defendants Joan Ritter, Esq. and Laura Henigman, Esq., co-conspirators, terminated my employment on April 24, 2007 because they had an independent, personal interest in terminating my employment. On or about April 23, 2007, I called the press and disclosed the identity of defendants Ritter and Henigman as individuals who knew the janitor at the Queens D.A.'s Office had been afflicted with active tuberculosis, visited him in the hospital, and thereafter covered up the epidemic for several months. I informed the press that if they had any further questions they could contact defendants Ritter and Henigman, which, upon information and belief, they did. Accordingly, these defendants were motivated by an independent personal stake in seeing me fired, when they retaliatorily terminated my employment on April 24, 2007.

49. These unconstitutional objectives went outside the interests of the District Attorney's Office. Additionally, co-conspirators Ritter and Henigman's actions on April 24, 2007 were not in the normal course of their duties, which was to supervise the processing and prosecution of criminal cases when they were present and participated in the termination of my employment from the Queens District Attorney's Office.

50. On or about May 2, 2007, upon learning that I had secured alternative employment, defendants John Ryan, Joan Ritter, Laura Henigman, Jim Quinn and Lieutenant Stephanie Hunter, acting in concert, agreed to violate my 14th Amendment liberty right under the U.S. Constitution to enter and have access to a public courthouse, my 4th Amendment right to enter said courthouse free of unjustified, unsubstantiated, and unreasonable seizures, my Fourteenth Amendment liberty right to practice the profession of law without being unjustifiably banned from a public courthouse, removed from a public courtroom, and repeatedly detained and surrounded by court officers and other law enforcement personnel, and my federal statutory rights under 42 USCS section 1983 and 1985.

51. On or about May 2, 2007 and May 4, 2007, Lieutenant Stephanie Hunter, acting in furtherance of her conspiracy with defendants Brown, Ritter, Quinn, Ryan, and Henigman, engaged in an overt act to deprive me of the aforementioned consitutional rights and rights arising under 42 U.S.C.S. Section 1983 when she ordered multitudes of court officers to surround and detain me for approximately fifteen minutes, upon which

time, on May 2nd, 2007, she barred me from entering the Queens Criminal Courthouse, and on May 4, 2007, she had me removed from a public courtroom.

52. On May 2, 2007, Lieutenant Hunter refused to offer an explanation as to why a security alert was being activated, and why I was being surrounded by multitudes of guards and detained for approximately fifteen minutes.

53. On May 2, 2007, prior to activating the security alert, I had passed through the metal detector of the courthouse without incident or any indication by that machine that I could conceivably be in a possession of any weapon. Nor was I engaged in any criminal conduct whatsoever that would warrant the activation of a security alert.

54. On May 4, 2007 I entered the courthouse and entered a public courtroom. After entering the courtroom and meeting a client, Lieutenant Hunter again activated a security alert. I was removed my a Sergeant and taken outside the entrance to the courtroom, where I was surrounded again by multitudes of armed guards for roughly ten minutes. Among those surrounding me was Lieutenant Hunter and Sgt Abruzzo of the D.A.'s Office. After making a scene in front of tons of people in the main corridor of the courthouse by activating an unjustified security alert, and achieving her mission of publicly embarrassing me, Lieutenant Hunter called off the alert and told me I was free to go back into the courtroom.

55. At no point in time was I searched to verify that I was not a security risk, nor was I questioned or accused of engaging any illegal activity. At no point in time was I arrested or issued a desk appearance ticket for engaging in any questionable activities. Nor was I removed from the building on May 4, 2007, which would be consistent with being a security threat. Again, Lieutenant Hunter refused to provide any basis or justification for my removal and seizure as she clearly lacked probable cause, and at a minimum, reasonable suspicion, for the seizures that she ordered and effectuated on both May 2, 2007 and May 4, 2007. Accordingly, the activation of a security alert for someone Lieutenant Hunter clearly knew was not a threat and for whom she had no particular set of facts upon which to base such a security alert, was an abuse of her authority.

56. Knowing that I was not a security threat, and knowing that the security alert she had activated was frivolous, Lieutenant Hunter allowed me to reenter the courtroom, but not before laughing about the incident with Sgt. Abruzzo of the D.A.'s Office. Moreover, Hunter began making commentary to Sgt. Abruzzo, indicating she knew I was not really a threat.

57. Knowing she had no good faith basis to detain me with armed guards and no justification for doing so, Hunter nevertheless willfully violated my Fourteenth Amendment liberty right to have access to a public courtroom free of harassment and my Fourth Amendment right to be free of unreasonable seizures. Her illegal acts were premised on amusement and sadism, rather than evidence rising to the level of probable cause or, at a minimum, reasonable suspicion.

58. Lieutenant Hunter's actions were not objectively reasonable because, as indicated by her behavior on May 4, 2007 with Sgt. Abruzzo, she made commentary to Abruzzo about knowing the security alert was frivolous, while she laughed about the ordeal she had put me through. Additionally, absent any credible evidence to believe I was a security threat, such as metal detectors going off, and the related discovery of a weapon, chemical agent, or other dangerous instrument, there was absolutely nothing upon which a reasonable court officer could base her decision to activate a security alert on.

59. Even if the District Attorney's Office, infuriated that I had exposed tuberculosis at the D.A.'s Office, had made such insinuations to Lieutenant Hunter, a Lieutenant is obligated to investigate the basis for such allegations before ordering multitudes of armed guards to repeatedly surround and detain me. Vague and unsubstantiated allegations, with no evidentiary foundation, are not adequate to provide either reasonable suspicion or probable cause for a seizure.

60. No reasonable court officer in Lieutenant Hunter's position, would believe that they were justified in detaining an attorney on the grounds that they were a security threat, absent a scintilla of evidence to support such baseless and vague allegations.

61. The liberty right of an individual to practice the profession of their choosing by entering a public courthouse is a recognized right under the due process clause of the Fourteenth Amendment of the United States Constitution, and any reasonable official in Hunter's position would know that seizing an attorney by surrounding her with armed guards without any credible, substantiated, justification for doing so was violative of that attorney's clearly established 14th Amendment right as well as the application of that right to state officials via 42 U.S.C.S Section 1983.

62. The substantive due process liberty right, under the 14th Amendment, to practice the profession of one's choosing without interference by a state actor is a right recognized by the Supreme Court of the United States.

63. The 4th Amendment right to be free from unreasonable seizures, made applicable to the states through the 14th Amendment of the United States Constitution is a clearly established right recognized by the Supreme Court of the United States and the Second Circuit.

64. For the foregoing reasons, any reasonable court officer in Lieutenant Hunter's position would know that what she was doing in ordering an attorney to be surrounded by armed guards, detained, barred from a courthouse, and subsequently removed from a courtroom, was violative of a clearly established constitutional right.

65. Lieutenant Hunter's actions violated clearly established law, it was not objectively reasonable for defendant to believe that her actions did not violate such law. Moreover, her laughter and commentary about the bogus security alert are indicative of the

unreasonableness of her actions.

66. Lieutenant Hunter is a state official whose aforementioned acts were unconstitutional. As such she is stripped of her official or representative character and her unconstitutional conduct constitutes state action under the Fourteenth Amendment of the U.S. Constitution, but not the 11th Amendment for purposes of sovereign immunity.

67. Subsequent to surrounding me on May 4, 2007, Lieutenant Hunter, an employee of the Office of Court Administration, and Sgt. Abruzzo, an employee of the District Attorney's Office, walked off together laughing about how they had publicly humiliated me with a bogus security alert, at which time a Sergeant who had participated in detaining me outside of the courtroom apologized for his actions, stating he knew what they were doing was wrong, but that he had no choice but to follow Hunter's orders. Several other court officers approached me with similar commentary.

68. In the middle of May 2007 I entered the Queens Criminal Courthouse and, as I was going through the metal detectors, was approached by a guard who informed me she was supposed to detain me if I tried to enter a building. However, this court officer indicated she would not detain me because it was wrong what they were doing to me. She allowed me to pass through the metal detectors and to enter the courthouse.

69. John Ryan, Jim Quinn, Joan Ritter, and Laura Henigman, and Richard Brown,, acting in concert with Lieutenant Hunter, of the Office of Court Administration, have engaged in a campaign to disparage my name and reputation through false accusations of my being a danger to the public and an incompetent attorney. Lieutenant Hunter, in conjunction with the above named defendants of the Queens District Attorney's Office willfully and maliciously trampled on every constitutional right that I am entitled to as an American. Acting together, the above individuals ordered court personnel to stop and surround me, in the multitudes, every time I tried to enter a public building; to wit, a courthouse. In the process of unreasonably detaining me and surrounding me, members of the Queens District Attorney's Office, such as Laura Henigman and Sgt. Abruzzo, have joined the ranks of those guards who routinely surround me. I have been prevented from practicing law in a public courthouse, humiliated in front of my clients, detained and removed from a public building, and been disparaged to no end. At no point in time was I ever a danger to the public and the actions of the above Defendants was nothing more than pure harassment. It was an abuse of power by a group of state officials in a supervisory capacity, who think they are above the laws of New York and of the United States, and found it entertaining to gang up on one person.

70. Lieutenant Hunter acted ultra vires because there was no colorable basis for her to exercise the authority to have me surrounded by multitudes of armed guards and temporarily detained absent probable cause, or, at a minimum reasonable suspicion. C.P.L. 140.25 governs the situations when a peace officer, which included a court officer, can detain someone, and no subsection of that statute applies to this case since, at no

point in time, was there reason to believe I had committed an offense. Accordingly, Hunter lacked the delegated authority to order a security alert of an attorney against whom no credible, substantiated evidence of wrongdoing existed.

## FIFTH CAUSE OF ACTION-
## DEFAMATION

71. On May 1, 2007 I began to work for an attorney named Albert Dayan on a per diem basis, covering cases in Queens Criminal Court. We simultaneously executed a lease agreement, whereby I would rent space in his law suite.

72. Immediately after beginning to work with Albert Dayan, on or about May 2, 2007, the Queens District Attorney's Office began to disparage my name and my reputation. Specifically, John Ryan, Jim Quinn, Joan Ritter and Laura Henigman contacted Lieutenant Hunter, who supervised all the court officers working out of the Queens Criminal Courthouse. The above Defendants stated to Lieutenant Hunter, and the court officers under her supervision, the following: "Tammy Harris was fired from the D.A.'s Office. She is a security threat and we want her surrounded and stopped every time she enters the courthouse". Moreover, the above Defendants told Lieutenant Hunter "The D.A. wants to be alerted every time Tammy tries to enter the building. Activate a security alert every time she shows up. Do not let her in to the courthouse." These statements were false and malicious, and at no point in time was I ever a security threat.

73. On or about May 2, 2007, Lieutenant Hunter notified all court officers that "Tamara Harris is a security threat" and "stop her if she tries to enter the building and activate a security alert." This statement was false and malicious.

74. Upon information and belief, on or about May 2, 2007, Lieutenant Hunter had a telephone conversation with Albert Dayan, whereupon she indicated if he wanted to utilize my services in the Queens courthouse, I would be subjected to security alerts, detention, and removal due to my security threat status per the wishes of the D.A.'s office.

75. Lieutenant Hunter knew that I was not a security threat in May of 2007, when she ordered court officers to surround me, as evidenced by her behavior with Sgt. Abruzzo, as stated above, and as evidenced in her conduct of allowing me back into the courtroom from which I was removed after publicly humiliating me by ordering that I be surrounded by multitudes of armed court officers.

76. On or about May 2, 2007, Richard Brown, John Ryan, Jim Quinn, and Joan Ritter, started disseminating rumors to court officers at the Queens courthouse, that I was an inept lawyer. These defendants stated that "Tammy Harris is an incompetent lawyer." This statement was false , malicious, and caused damage to my reputation.

77. Joan Ritter, Bureau Chief of the Criminal Court Bureau, subsequently contacted

one of my former complainants, whose harassment case I was prosecuting, and stated to him that I was "not a competent attorney." This statement was false and malicious and damaged my reputation.

78. The Queens District Attorney's Office, through its employees: John Ryan, Jim Quinn, Joan Ritter, Laura Henigman, and Sgt. Abruzzo, began to disseminate my photograph to all court officers and court personnel, stating that I was a "security threat" and that I was to be "stopped and surrounded every time I enter the courthouse and the D.A.'s Office was to be alerted."

79. On or about May 2, 2007, John Ryan, Jim Quinn, Joan Ritter and Laura Henigman told prosecutors at the Queens District Attorney's Office, including Brad Chain and all those working in the Criminal Court and Intake Bureaus, as well as other bureaus, that "Tammy Harris is a security threat and that the door codes to the Borough Hall building have been changed so that she cannot enter the building." The office that I once occupied was sealed off and detectives working for the Queens District Attorney's Office told prosecutors, such as Brad Chain, that no one was allowed in the office because I was a security threat. My photograph was subsequently disseminated to the above mentioned prosecutors, at the instruction of Jim Quinn, John Ryan, Joan Ritter and Laura Henigman, and prosecutors and support staff were instructed to notify law enforcement if they saw me.

80. Jim Quinn, in his communications with Albert Dayan, urged him to terminate his employment relationship with me, based on the above defamatory statements, and threatened retaliation if Mr. Dayan did not sever his ties with me. As a result, Albert Dayan ceased utilizing my services as a per diem attorney and cancelled our lease agreement for office space.

81. The communications of the Queens District Attorney's Office, through the above named Defendants, were published, in that they were conveyed to prosecutors, a complainant known to me, Lieutenant Hunter, and a multitude of court officers in the Queens courthouse. Lieutenant Hunter then escalated the situation by notifying all court officers that I was a security threat, thereby making a further publication of the initial defamatory statements concocted by the above named employees of the Queens District Attorney's Office. The aforementioned statements of Lieutenant Hunter were false, malicious, and made with the intent to harm my reputation. Moreover, she had no good faith belief in their truth, in light of her above mentioned conduct with Sergeant Abruzzo on May 4, 2007.

82. As a result of the publication described in the above paragraph, my reputation was harmed so as to lower me in the estimation of the community and to deter third persons from associating or dealing with me.

83. The actions and statements of the Queens District Attorney's Office, through its

employees, in making untruthful statements characterizing me as a "security threat" and then as an "incompetent attorney" were false, willful and malicious, and were made with the sole intent to disgrace and discredit me.

84. The above defamatory statements and actions; to wit, the dissemination of my photograph, were made within one year of the commencement of this action and caused me suffer damage to my reputation, and to lose my job with Albert Dayan and the income that I derived from Mr. Dayan.

## SIXTH CAUSE OF ACTION- INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS AND CONTRACTUAL RELATIONS-

85. Plaintiff realleges all of the above paragraphs.

86. On or about May 2, 2007, when Lieutenant Hunter had me surrounded by multitudes of court officers she had a conversation with Albert Dayan, whereby he informed her that I worked for him and was needed in the courthouse. In reaction, Lieutenant Hunter informed Albert Dayan that I was forbidden from accompanying him into the courthouse.

87. On May 2, 2007 Lieutenant Hunter became aware that I was employed by Albert Dayan, upon Dayan informing her of such.

88. Upon information and belief, on or about May 3, 2007 Albert Dayan and Lieutenant Hunter had a telephone conversation whereby she informed him I would be detained every time he sent me into the courthouse and that she would not lift the security alert at the request of the D.A.'s Office.

89. On or about May 10, 2007 Jim Quinn engaged in a telephone conversation with Albert Dayan, warning him not to employ me and threatening repercussions if he continued to do so. Subsequent to that telephone conversation, Albert Dayan informed me that he had to let me go because, as he put it, he was afraid to mess with the District Attorney's Office. Additionally, Albert Dayan indicated he would not abide by our lease agreement and that I could no longer rent office space from him in light of the conversation he had with Jim Quinn. Moreover, the fact that court officers were treating me like a security threat and removing me from the courthouse, at the bequest of the District Attorney's Office, rendered it impossible for him to continue using me as a per diem attorney. Jim Quinn and Lieutenant Hunter, along with the above named Defendants, were the direct cause of me losing my job and lease with Albert Dayan.

90. Defendants Quinn and Hunter, acting in concert, intentionally procured Albert Dayan's breach of our employment contract and lease agreement.

91.     Defendants interfered with my business relations with Albert Dayan with the sole purpose of harming me, without excuse or justification, but only with a sense of disinterested malevolence. There comments were motivated solely to inflict harm on me.

92.     Moreover, these Defendants statements and actions have caused me to suffer damage to my personal and professional reputation, present and future financial loss, as well as serious emotional distress.

## SEVENTH CAUSE OF ACTION-
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93.     All of the above named defendants have engaged in extreme and outrageous conduct. The Queens District Attorney's Office, through John Ryan, Jim Quinn, Joan Ritter, Laura Henigman, and Richard Brown, has intentionally and vindictively terminated my employment as an assistant district attorney so that I would cease voicing my concerns about working in a Tuberculosis infested environment. Then, after wrongfully firing me, the District Attorney's Office, through its employees began to disparage my reputation by falsely claiming that I was a security threat. Then, as if that was not despicable enough, these Defendants conspired with Lieutenant Hunter to prevent me from entering a public courthouse and practicing the profession that I love. They harassed me with baseless and unjustifiable security alerts, surrounded me with guards on a routine basis, and religiously removed me from both the courthouse and courtroom in front of both Albert Dayan and my clients. They did all of these things under the pretense that I was a danger to society. However, the true motivation was to break me down emotionally to such and extent that I was physically and mentally incapable of practicing law in Queens County. I had threatened to sue the District Attorney's Office when the above Defendants told me I had the choice of returning to my contaminated office or losing my job. This was the Defendants' way of retaliating against me, and punishing me for speaking up for myself and speaking out about a deadly disease, which Defendants' purposely concealed for months.  And then, as if that conduct was not outrageous enough, Laura Henigman and Sgt. Abruzzo, came to watch as the court officers surrounded me, as if this whole travesty of justice was entertaining and funny. The actions of the above defendants were beyond malicious- they were outright sadistic. As such, the above Defendants intended to cause me to suffer severe emotional distress.

94.     On or about May 4, 2007 Lieutenant Stephanie Hunter activated a security alert whereby I was removed from a public courtroom in the presence of my client and surrounded by multitudes of armed guards for several minutes. After detaining me for no cause, Lieutenant Hunter laughed and commented to Sgt,. Abruzzo about the bogus security alert she had activated. Her conduct was intentional, malicious. Accordingly, she is being sued, not only in her official capacity, but in her ;personal capacity for intentional infliction of emotional distress.

95.     I suffered severe emotional distress as a result of defendants' extreme and

outrageous conduct, which distress was caused by defendants conduct.

96. All of the above named defendants' conduct went beyond the bounds of decency and are regarded as atrocious and utterly intolerable in a civilized community.

## DAMAGES

97. WHEREFORE, Plaintiff seeks compensatory damages in the form of lost wages, amounting to my yearly salary of $55,000; Plaintiff seeks punitive damages in the amount of $ 1,000,000; Plaintiff seeks damages for emotional distress, in the amount of $1,000,000; Plaintiff's seeks an injunction against Lieutenant Stephanie Hunter, preventing her from any future detentions of Plaintiff when Plaintiff attempts to enter or enters the public courthouse located at 125-01 Queens Boulevard. All damages are sought against defendants in their official and personal capacities. Additionally, Plaintiff seeks to be compensated for the costs and disbursement of this action.

DATED: New York, NY
        September 4, 2008        Respectfully Submitted,

*[signature]*
Tamara M. Harris
10 West 15th Street, Apt. 324
New York, NY 10011
(212) 710-2758