UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TAMARA M. HARRIS,

               Plaintiff,

       -against-

QUEENS COUNTY DISTRICT ATTORNEY'S
OFFICE; RICHARD BROWN, ESQ., individually
and as District Attorney of Queens County;
JOAN RITTER, ESQ., individually and as a Bureau
Chief of the Criminal Court Bureau of the Queens
District Attorney's Office; JOHN RYAN, ESQ.,
individually and as Senior Executive Assistant District
Attorney; JIM QUINN, ESQ., individually and as
Senior Executive Assistant District Attorney;
LAURA HENIGMAN, ESQ., individually and as
Bureau Bureau of the Intake Bureau at the Queens County
District Attorney's Office; and LIEUTENANT
STEPHANIE HUNTER, individually and as Lieutenant
of the Unified Court System/Office of Court
Administration,

               Defendants.
---------------------------------------------------------------X

**REPORT & RECOMMENDATION**
**08 CV 1703 (CBA) (LB)**

**BLOOM, United States Magistrate Judge:**

      Plaintiff, Tamara M. Harris, a licensed attorney proceeding *pro se,* files this action

pursuant to 42 U.S.C. §§ 1983 and 1985 against the Queens County District Attorney's Office,

the Queens County District Attorney Richard Brown, four Queens County Assistant District

Attorneys (collectively "DA defendants"), and Lieutenant Stephanie Hunter, a court officer

employed by the New York State Office of Court Administration. Plaintiff alleges defendants

violated her First, Fourth and Fourteenth Amendment rights and also brings claims under state

law. Defendants move for summary judgment. The Honorable Carol Bagley Amon, Chief

Judge, referred defendants' motions to me for a Report and Recommendation ("R&R") in

accordance with 28 U.S.C. § 636(b). For the following reasons, defendants' motions should be

granted in part and denied in part.

## BACKGROUND

The following facts are supported by admissible evidence or taken in the light most favorable to plaintiff.[1] From August 9, 2005 to April 24, 2007, plaintiff was employed at the Queens County District Attorney's Office ("DA's Office" or "DA") first as a criminal law associate and then as an assistant district attorney after passing the bar examination. Amended Complaint ("Am. Compl.") ¶¶ 5, 20; Deposition Transcript of Tamara Harris ("Harris Dep.") 14:6-10.[2] On or about January 2007, a janitor working in the DA's Office became infected with tuberculosis ("TB"). Am. Compl. ¶ 6; Harris Dep. 40:13-24; Deposition of Joan Ritter ("Ritter Dep.") 101:4-9. In April 2007, the Department of Health and Mental Hygiene's Bureau of TB Control tested employees at the DA's Office for the disease. Am. Compl. ¶¶10-11; Harris Dep. 38:17-21; Deposition Transcript of Laura Henigman ("Henigman Dep.") 55-56. While plaintiff tested negative for the disease, other DA employees tested positive, including plaintiff's office-mate. Am. Compl. ¶¶ 12-13; Harris Dep. 38:24-39:5-18, 41:23-24, 47:13-16. The Department of Health's epidemiologist, Magali Calderon, testified that there was one active case of TB

---

[1] Plaintiff did not file a statement of material facts pursuant to Local Civil Rule 56.1(b). Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" of the allegedly undisputed material facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is no genuine issue to be tried. See Local Rule 56.1(a); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). A party opposing summary judgment is required to submit a counter-statement under Rule 56.1(b). As plaintiff did not do so, the Court may deem the defendants' Rule 56.1 statement as admitted. See Local Rule 56.1(c). However, the Court may not rely solely on the statement of undisputed facts in the Rule 56.1 statement. The Court accepts as true only those facts which are supported by record evidence. Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); Giannullo, 322 F.3d at 143, n.5.

[2] The parties submitted several copies of the same deposition transcripts and supporting documents. If submitted by only one party, the references to the document will identify the party, otherwise, only the transcripts or document will referenced.

confirmed in the DA's Office. Pl. Aff., Exhibit C, Deposition of Magali Calderon ("Calderon Dep.") at 42, 55.

On April 23, 2007, plaintiff called in sick, Harris Dep. 52:16-20, and contacted the press to report the TB outbreak because she believed DA officials were lying about whether there was a risk of contagion. Id. at 40:3-5, 54:14-15, 57:21-58, 64-65; Henigman Dep. 68:19-69:15; see also Pl. Aff., Ex. B (telephone records). The TB outbreak was not reported by the media. Harris Dep. 85: 11-13.

On April 24, 2007, plaintiff sent a letter informing her supervisors that she would not return to the office and would use her vacation time because she was concerned about contracting the disease. Id. at 83:8-10. She later decided to go in person to talk to Laura Henigman to see if she could get a desk in the intake area or another bureau. Id. at 72:19-24. Upon her arrival at the office, plaintiff was taken by Henigman and Ritter to a meeting with Jim Quinn, the Senior Executive Assistant District Attorney. Quinn stated that he wanted plaintiff to resign and that her work was substandard. Id. at 70:9. Plaintiff was ordered to return to work or resign. Id. 70:15-18, 74:14-16; Ritter Dep. 121:14-17; 122:3. Plaintiff refused to do either and went home. Harris Dep. 70:16-17, 74:16-17.

On or about April 25, 2007, plaintiff received a letter dated April 24, 2007, from John Ryan, the Chief Assistant District Attorney, stating that she was fired for "poor performance and insubordination." Id. 71:16-18, 74:24-25; Henigman Dep. 76:10-15. Seacord Decl., Exhibit P (Plaintiff's Termination Letter). Plaintiff did not immediately return her identification card to the DA's Office, but instead gave it to an attorney she had retained. Harris Dep. 107:2-3, 107:21-25, 111:22-25; Henigman Dep. 80:11-14, 80:22-81:5.

Soon after her termination, plaintiff was hired by a private practitioner, Albert Dayan, Esq., on a *per diem* basis. Harris Dep. 91-92:8; Connell Decl., Exhibit D (Deposition Transcript of Albert Dayan ("Dayan Dep.") 7:9. On the morning of May 2, 2007, plaintiff entered the Queens Criminal Courthouse without incident. Harris Dep. 99:12-17, 116:20-22. In the afternoon of May 2, 2007, however, plaintiff was stopped by court security when she attempted to enter the courthouse with Dayan through an entrance for lawyers. Id. 113:14-24; Dayan Dep. 11:17-22. A court officer assigned to guard that entrance did not allow plaintiff to go through because she did not have a secure pass or other valid identification for use at that entrance. Connell Decl., Tursi Aff. ¶ 9; Falke Aff. ¶¶ 2, 7.[3] The court officer called a supervisor, defendant Lieutenant Stephanie Hunter ("Hunter") of the Office of Court Administration. Tursi Aff. ¶¶ 9-10; Falke Aff. ¶¶ 7-8; Hunter Aff. ¶¶ 5-10. When Hunter arrived at the entrance, she told Dayan that he could enter the building, but that plaintiff would have to use the public entrance. Dayan Dep. 12:5-12, 13:15-19, 16:2-5, 33:11-18, 50:16-22, 77:23-24; Hunter Aff. ¶ 13; Pl. Opp., Exhibit A, Deposition of Stephanie Hunter ("Hunter Dep.") 85:21-86:5. Plaintiff did not enter the courthouse and instead waited for Dayan to return from the courtroom and left with him. Harris Dep. 123:10-17; Hunter Aff. ¶ 13. Plaintiff alleges that both defendant Hunter and the court officer told her that she was "barred from the building today." Harris Dep. 124:11-22.

On May 4, 2007, plaintiff entered the courthouse through the public entrance. Am. Compl. ¶ 32; Harris Dep. 134:13-15. However, while meeting with a client inside one of the

---

[3] Defendant Hunter provides affidavits from two court officers who were present on May 2, 2007: Officer Tursi was assigned to "patrol" the Queens Criminal Courthouse, see Connell Decl., Tursi Aff. ¶ 2, and Officer Falke was assigned to the "DA door" at the back entrance of the courthouse, Tursi Aff. ¶ 9, Connell Decl., Falke Aff. ¶ 2. Although plaintiff alleges that she was approached by over ten court officers at the entrance, plaintiff only specifies one unidentified court officer who was initially present when she tried to enter with Dayan.

courtrooms, she was asked to leave, in order to speak to Sergeant Abruzzo of the Queens DA's Office, who inquired about the return of her DA identification. Harris Dep. 136:22-137:6; Pl. Opp., Exhibit F, Abruzzo Dep. 15:14-16. Hunter and other court officers were there when plaintiff exited the courtroom. Harris Dep. 137:3-5; Hunter Dep. 58:6-9; Abruzzo Dep. 26:12-14. After about ten minutes, plaintiff concluded her conversation with Abruzzo and returned to the courtroom. Harris Dep. 141:2; Abruzzo Dep. 27:13-15; Hunter Dep. 59:6-18, 96:17-21. Shortly thereafter, Dayan terminated plaintiff's *per diem* employment relationship based on a mutual understanding that it would not work. Harris Dep. 147:8; Dayan Dep. 20:10-13, 24:19-25. On May 17, 2007, plaintiff returned her DA identification card through her attorney. Harris. Dep. 205:5-22. In June 2007, plaintiff started her own law practice. Harris Dep. 216:18-20.

## **PROCEDURAL HISTORY**

On September 4, 2008, plaintiff filed this *pro se* complaint pursuant to 42 U.S.C. §§ 1983 and 1985. Plaintiff seeks compensatory damages for lost wages in the amount of her yearly salary of $55,000 and punitive damages in the amount of $1,000,000, plus costs. Am. Compl. ¶ 97. Plaintiff also seeks damages for emotional distress in the amount of $1,000,000 and an injunction to prevent Hunter from barring her entry into the Queens Criminal Courthouse. Id.

On October 7, 2008, Hunter moved to dismiss the complaint and asserted that she was entitled to sovereign and qualified immunity. I recommended that Hunter's motion to dismiss should be granted in part and denied in part. The Report and Recommendation was adopted in its entirety. (Docket entry #28). The following claims against Hunter have already been dismissed: (i) plaintiff's Fourth Amendment claim that she was unlawfully seized by court officers on May 2, 2007 and May 4, 2007; (ii) plaintiff's Fourteenth Amendment claim that she

was denied the right to practice law; (iii) plaintiff's conspiracy claim pursuant to 42 U.S.C. § 1985, (iv) plaintiff's state law tortious interference claim, and (v) plaintiff's state law intentional infliction of emotional distress claim. Plaintiff's First and Fourteenth Amendment claims that she was denied access to the courthouse as well as plaintiff's defamation claim remain. Hunter and the DA defendants now move for summary judgment. Plaintiff opposes both defendants' motions and defendants have replied.

## **DISCUSSION**

## I.      **STANDARD OF REVIEW**

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A genuine dispute as to any material fact exists where "a reasonable jury could return a verdict for the nonmoving party." Redd v. Wright, 597 F.3d 532, 536 (2d Cir. 2010) (internal quotation marks omitted); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also Baker v. The Home Depot, 445 F.3d 541, 543 (2d Cir.

2006) (resolving all ambiguities and drawing all inferences in favor of the non-moving party on summary judgment). The Court views the facts here in the light most favorable to plaintiff.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . ." Fed. R. Civ. P. 56(c)(1)(A); see Matsushita, 475 U.S. at 586-87. In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Niagara Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)); Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002) (same). Moreover, "'[t]he mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Niagara, 315 F.3d at 175 (quoting Anderson, 477 U.S. at 252).

"A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). However, plaintiff is an admitted attorney. As "the rules afforded *pro se* litigants are not relaxed when that litigant is also an attorney," see Larsen v. JBC Legal Group, P.C., 533 F.Supp.2d 290, 295 n.2 (E.D.N.Y. 2008), the Court need not construe plaintiff's pleadings liberally "to raise the strongest arguments they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82 n.4 (2d Cir. 2001) (internal quotation marks omitted).

II.     **DEFENDANT HUNTER'S MOTION FOR SUMMARY JUDGMENT**

A.      **First Amendment Claim – Access to the Court**

To sustain a claim brought under 42 U.S.C. § 1983, a plaintiff must show that the defendant (a) acted under color of state law (b) to deprive the plaintiff of a constitutional right. Colombo v. O'Connell, 310 F.3d 115, 117 (2d Cir. 2002). Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). Plaintiff's right of access to the courts as a non-party is rooted in the First Amendment which protects access for the public and the press. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573 (1980) ("the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated."); Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004) (citing Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir. 1984) (asserting that "the First Amendment does secure to the public and to the press a right of access to civil proceedings")). To establish a violation of the right of access to the courts, a plaintiff must show an "actual injury" caused by the alleged denial of access. Lewis v. Casey, 518 U.S. 343, 349-53 (1996); Monsky v. Moraghan, 127 F.3d 243, 246 (2d Cir. 1997).

Plaintiff alleges that defendant Hunter prevented her from entering the Queens Criminal Courthouse on May 2, 2007, when she was accompanied by Albert Dayan in violation of her right to access the court under the First Amendment. Plaintiff further alleges that defendant Hunter falsely identified her as a "security threat."

Plaintiff fails to establish that defendant Hunter denied her access to the court on May 2, 2007. The record shows that plaintiff entered the courthouse early that day without incident, Harris Dep. 99:12-17, 116:20-22, although it is unclear whether plaintiff used the public entrance or the DA entrance to enter the courthouse in the morning. However, later that afternoon, when she returned with Dayan, plaintiff was not allowed to enter the courthouse through the DA entrance because she lacked the proper credential to use that entrance. <u>See</u> Dayan Dep; 11-12; Hunter Aff. ¶ 10; Tursi Aff. ¶ 9; Falke Aff. ¶ 7. Defendant Hunter testified that plaintiff attempted to enter through the non-public entrance with a white business card. Hunter Dep. 31-32, 43:18-23.

Plaintiff does not dispute that she lacked the proper credential to enter through that entrance. Instead, plaintiff argues that the lack of proper identification was used as a pretext to hide the fact that she was barred from the courthouse. However, plaintiff's testimony belies that she was barred from the courthouse since she admits that she entered the courthouse earlier that same day without incident and states that she has entered the courthouse "many times" since May 2007. Harris Dep. 146:24; 149:21-25. Attorney Dayan, who was present on May 2, 2007, testified that defendant Hunter did not say plaintiff was "barred" from the courthouse. Dayan Dep. 15:14-19, 32:10; Hunter Dep. 47:10-14, 50:8-11 ("I told you that you had to come through the front door"); Hunter Aff. ¶¶ 12-17. Moreover, plaintiff does not allege that she tried to enter the courthouse through the public entrance and was denied.

Plaintiff attempts to discredit Dayan's testimony as "simply false" or a product of retaliation by defendants. However, plaintiff's claim is conclusory and flatly denied by Dayan. <u>See</u> Dayan Dep. 23, 64:12-17. Plaintiff's allegation that the court officers filed "perjurious

affidavits" is not supported by any evidence. Other than her own deposition testimony, plaintiff provides nothing to support her First Amendment claim that Hunter denied her access to the Court.

Even if plaintiff had established that Hunter denied her access to the court on May 2, 2007, she has not shown that she sustained an actual injury from the denial. <u>Lewis</u>, 518 U.S. at 349; <u>Cathedral Church of the Intercessor v. Incorporated Village of Malverne</u>, 353 F.Supp.2d 375, 388 (E.D.N.Y. 2005). Although plaintiff argues that as a *per diem* employee, her failure to accompany Dayan to the court appearance on May 2, 2007, deprived her of income, her claim is conclusory and she fails to provide support for that conclusion. There is no testimony from Dayan that he refused to pay her for failing to accompany him to the court appearance and plaintiff provides no evidence that she was not paid for missing that court appearance. Furthermore, Dayan testified that he did not terminate his arrangement with plaintiff because she had difficulty in entering the courthouse. Dayan Dep. 21:22-25, 24:19-25. Instead, the record demonstrates that Dayan's court appearance was so brief on May 2nd that plaintiff opted to wait for him instead of seeking to enter the courthouse at the public entrance. Harris Dep. 123:10-17; Hunter Dep. 33:13-34:4; Hunter Aff. ¶ 13. The Court finds that plaintiff fails to show an actual injury based on Hunter's actions on May 2, 2007. <u>Colondres v. Scoppetta</u>, 290 F.Supp.2d 376, 382 (E.D.N.Y. 2003) ("*De minimus* interference with access to the courts is not constitutionally significant.") (citations omitted); <u>see</u> <u>Monsky</u>, 127 F.3d at 247 (distress and humiliation alone are insufficient to allege an actual injury).

Finally, to the extent plaintiff alleges she was removed from the courtroom on May 4, 2007, in order to speak to Sergeant Abruzzo regarding her DA identification, there is no

allegation that she was not able to return to the courtroom and complete her assignment. In fact, plaintiff admits that she did just that. See Harris Dep. 144:3-8. Therefore, defendant Hunter's motion for summary judgment should be granted regarding plaintiff's First Amendment access-to-the-court claim.

### (1) Qualified Immunity

Government officials may assert qualified immunity with respect to damage claims asserted against them in their individual capacities. Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993). Government officials are entitled to qualified immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994). A right is clearly established if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (citing Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)). When determining whether a right is clearly established, this Court looks to the law of the Supreme Court and the Second Circuit at the time of the defendant's actions. Huminski v. Corsones, 396 F.3d 53, 88 (2d Cir. 2005) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Defendant Hunter argues she is entitled to qualified immunity. Def's. Mem. at 14. As the Court finds that defendant Hunter did not violate plaintiff's clearly established constitutional rights, the Court need not reach defendant Hunter's qualified immunity claim.[4]

---

[4] "If no constitutional or statutory right was violated – construing the facts in favor of plaintiffs – we need not conduct further inquiries concerning qualified immunity." Demoret v.

### (2)  Sovereign Immunity

Although state officials are generally immune from damages under the Eleventh Amendment, a federal court may award prospective relief against state officials for violations of federal law.  <u>Deposit Ins. Agency v. Superintendent of Banks</u>, 482 F.3d 612, 617 (2d Cir. 2007) (citing <u>Ex Parte Young</u>, 209 U.S. 123 (1908)); <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 99-100 (1984).  There is no basis on this record to award plaintiff prospective injunctive relief against defendant Hunter.  Plaintiff admits that she has entered the Queens Criminal Courthouse "many times," without incident since the May 2, 2007 incident and she was "never actually prevented" from entering the courthouse.  Harris Dep. 146:24; 149:21-25.  Further, plaintiff fails to demonstrate that she has been denied access to any entrance of the courthouse for which she had proper identification.  Therefore, defendant Hunter's motion for summary judgment should be granted regarding plaintiff's request for prospective injunctive relief.

### B.      State Law Claim - Defamation

Under New York law, the elements of a defamation claim are "(1) that defendants made a false defamatory statement of fact; (2) that the statement was published to a third party; (3) that the statement concerned the plaintiff; (4) that the defendant was responsible for making the statement; and (5) that the statement was slander *per se* or caused special damages." <u>Baez v. JetBlue Airways</u>, 745 F.Supp.2d 214, 225 (E.D.N.Y. 2010) (citing <u>Albert v. Loksen</u>, 239 F.3d 256, 265 (2d Cir. 2001)).  Special damages is defined as "the loss of something having economic or pecuniary value," <u>Liberman v. Gelstein</u>, 80 N.Y.2d 429, 435 (1992), and "must be fully and accurately stated, with sufficient particularity to identify actual losses." <u>Jin Yung Chung v. Sano</u>,

---

Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).

No. 10-CV-2301, 2011 WL 1298891, at *6 (E.D.N.Y. Mar. 31, 2011) (citing <u>Ahmed v. Bank of</u> <u>America</u>, No. 09-CV-2550, 2010 WL 3824168, at *5 (E.D.N.Y. Sept. 24, 2010) (quotation omitted).

Plaintiff's amended complaint alleges that Hunter notified all of the court officers at the courthouse that plaintiff was a security threat. Am. Compl. ¶¶ 73, 81. Plaintiff claims that this statement was false, malicious, made with the intent to damage her reputation, and did in fact damage her reputation. Am. Compl. ¶¶ 81, 84. However, plaintiff has not proffered any evidence in opposition to defendant's motion to support the elements of a defamation claim. Hunter denies that she identified plaintiff as a "security threat," Hunter Dep. 46:2-25, and several court officers assigned to work on May 2, 2007 also deny being told that plaintiff was a security threat. <u>See</u> Hunter Aff. ¶¶ 14-17; Tursi Aff. ¶¶ 11-13, 16-17, 19; Falke Aff. ¶¶ 6, 10-13; <u>see</u> <u>also</u> Dayan Dep. 22:21-25 ("no one ever told me . . . anything negative about Ms. Harris"), 32:2-10, 33:11-18, 52:9-10; Henigman Dep. 94:12-95:20 (denying that she ever discussed plaintiff with defendant Hunter); Ritter Dep. 173-174.

Plaintiff relies on statements she attributes to court officer Lamagnia, but fails to provide Lamagnia's affidavit or deposition testimony. Thus, the statements attributed to Lamagnia are inadmissible. Plaintiff repeatedly relies on her own deposition testimony for statements she attributes to others. <u>See</u> <u>generally</u> Pl. Opposition. As an attorney, plaintiff should know that these statements are inadmissible hearsay and therefore cannot be considered in opposition to a motion for summary judgment. <u>See</u> <u>Equal Employment Opportunity Commission v. Bloomberg</u>, — F.Supp.2d —, 2011 WL 3599934 at *4, n.6 (S.D.N.Y. Aug. 16, 2011) (declining to consider hearsay statements as they are inadmissible to support opposition to summary judgment motion).

Plaintiff fails to produce any evidence that defendant Hunter published or communicated that plaintiff was a "security threat" to a third party. Navarra v. Marlborough Gallery, Inc., No. 10 Civ. 7547, 2011 WL 2623460, at *9 (S.D.N.Y. June 21, 2011) ("It is axiomatic that without an allegation of a false and defamatory statement a plaintiff cannot establish a cause of action for defamation."); Skyline Travel, Inc. v. Skylink Travel, Inc., No 08 Civ. 0991, 2011 WL 2419853, at *4 (S.D.N.Y. June 13, 2011) (dismissing plaintiff's defamation claim for lack of proof). Moreover, contrary to the claims in plaintiff's opposition, Pl. Opp. at ECF p. 21,[5] Dayan testified that he never spoke to defendant Hunter about plaintiff and further testified that defendant Hunter had nothing to do with plaintiff's termination. Dayan Dep. 21, 32-34; Hunter Dep. 70:20-71:2, 73:12-17. Plaintiff fails to demonstrate that defendant Hunter defamed her. Therefore, defendant Hunter's motion for summary judgment should be granted regarding plaintiff's defamation claim.

## III. DA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. First Amendment Claim - Retaliation

To sustain a First Amendment claim of retaliation, a public employee must show that "(1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection between the speech and the adverse employment action." Singh v. City of New York, 524 F.3d 361, 373 (2d Cir. 2008); Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008); see also Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011). "[A] matter of public concern" is one that "relat[es] to any matter of political, social or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983). For a public

_____

[5] Plaintiff's Opposition is not paginated, therefore, the Court refers to the page numbers assigned by the Electronic Case Filing system ("ECF").

14

employee's speech to be protected by the First Amendment, that speech must be made as a citizen and not pursuant to the employee's official duties on a matter of public concern. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006); Weintraub v. Board of Educ., 593 F.3d 196, 201 (2d Cir. 2010). Even if the public employee satisfies all three elements, the employer "can still prevail . . . if it can show that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" Cotarelo v. Village of Sleepy Hollow Police Dep't, 460 F.3d 247, 251-52 (2d Cir. 2006) (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

Plaintiff alleges that she engaged in protected speech. Specifically, plaintiff describes complaints she made to her supervisors Pamela Byer and Joan Ritter regarding exposure to tuberculosis and telephone calls made to various news media to alert them to a TB outbreak at the Queens DA's Office. It is undisputed that plaintiff complained internally and to the press about TB at the DA's office. Plaintiff also alleges that she suffered an adverse employment action as she was terminated from her position as an assistant district attorney and that the termination occurred because of her protected speech.

The DA defendants argue that plaintiff's internal complaints are not protected speech because they did not address a matter of public concern and that they did not retaliate against plaintiff for contacting the press because they would have terminated her regardless of her contact with the press.

Based on the "content, form and context" of plaintiff's internal complaints to her supervisors regarding her risk of tuberculosis exposure, the Court agrees with the DA defendants that plaintiff's internal complaints to her supervisors did not rise to the level of public concern

and therefore is not protected speech, Connick, 461 U.S. at 147-48; Isenalumhe v. McDuffie, 697 F.Supp.2d 367, 379-80 (E.D.N.Y. 2010) (dismissing portions of plaintiffs' complaints "to higher-ups within their department" as not involving matters of public concern). However, plaintiff's press contact is entitled to First Amendment protection as that speech involved a matter of public concern – a public health concern – and not an internal matter related to the DA's operations. Gangadeen v. City of New York, 654 F.Supp.2d 169, 182-183, 187 (S.D.N.Y. 2009) (recognizing that safety in the workplace is a matter of public concern) (citing cases). It is undisputed that New York City's Department of Health and Mental Hygiene was on site to test employees and provided pamphlets and informational sessions about TB. While plaintiff's information may have been acquired at the office and her motivation to contact the press may have been out of concern for her own health, this does not remove her speech from the realm of public concern. "Speech that relates to information acquired in the course of one's duties as a public employee may be protected speech." Burhans v. County of Putnam, No. 06 Civ. 8325, 2011 WL 1157693, at *4 (S.D.N.Y. Mar. 25, 2011); see Sousa v. Roque, 578 F.3d 164, 174 (2d Cir. 2009) ("a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern.").

Recognizing that plaintiff's press contact rises to the level of public concern, the DA defendants argue that there is no causal connection between plaintiff's contact with the press and her subsequent termination because "plaintiff's future at the Queens DA's Office was in jeopardy well before her alleged complaints regarding tuberculosis." DA Defs. Mem. at 9. The DA defendants argue that plaintiff's evaluations - containing above and below average marks - and her insubordination at the meeting held on April 24, 2007, one day following her contact with the press – were the bases for her termination.

"A plaintiff can establish a causal connection that suggests retaliation by showing that the protected activity was close in time to the adverse action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (citations omitted); Gangadeen, 654 F.Supp.2d at 188 (discussing temporal proximity between the speech and the discharge). The Court cannot imagine a better example of a causal connection established by temporal proximity than the facts of this case. Plaintiff contacted the press on April 23, 2007, was relieved of her three-year commitment on April 24, 2007, and thereafter terminated by letter dated April 24, 2007. Seacord Decl., Exhibit P (Plaintiff's Termination Letter).

The DA defendants do not dispute that plaintiff contacted the press, see Henigman Dep. 68:19-69:21; see also Pl. Aff., Exhibit B (telephone records), but claim that they intended to relieve plaintiff of her three-year job commitment on or about April 18, 2007, before plaintiff had contacted the press. Deposition Transcript of Jim Quinn ("Quinn Dep.") 92:11-16; Deposition Transcript of John Ryan ("Ryan Dep") 53:13-25. The DA defendants also contend that they did not know plaintiff had contacted the press *before* deciding to terminate her.

The DA defendants do not explain why they decided to relieve plaintiff of her three-year commitment on April 18th, see Quinn Dep. 64-65; Ryan Dep. 5, 102, except that defendant Ryan stated that it *may* have been related to the transfer of plaintiff's class of prosecutors to the Supreme Court. Ryan Dep. 6. However, no other defendants provide an explanation and there is no record evidence to support defendants' position. Instead, defendant Ritter testified that she did not know when the decision to call the April 24th meeting was made. Ritter Dep. 6:11-12. A reasonable juror could find it significant that plaintiff's last evaluation occurred on November 30, 2006, but that the meeting to discuss plaintiff's "substandard" work performance did not

occur until April 2007. Defendant Henigman admitted that "more than six months had elapsed" since plaintiff's work performance had deteriorated and that she did not know why she did not recommend that plaintiff be relieved of her commitment earlier or why she failed to warn plaintiff that there were problems with her work. Henigman Dep. 68:12-18; 90:7-20.

More importantly, however, is that plaintiff raises a genuine dispute of material fact regarding whether the DA defendants knew that plaintiff had contacted the press. Plaintiff testified that on the way to the meeting with defendant Quinn, defendants Henigman and Ritter said "some people don't know how to keep your [sic] mouths shut, some people have the nerve to call the press." Harris. Dep. 66:15-23; 69. Defendants Henigman and Ritter deny they made any such statements. Ritter Dep. 119; Henigman Dep. 87-88. Defendant Henigman did testify that she knew that plaintiff had contacted the press, but could not state when she found out, only that it was soon after plaintiff had been terminated. Henigman Dep. 68:19-69:21.

The DA defendants further argue that even if there is a causal connection, that connection was broken because plaintiff received poor evaluations well before her protected speech took place. Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("an inference of retaliation does not arise" . . . when "gradual adverse job actions began well before the plaintiff ever engaged in any protected activity."); Kantha v. Blue, 262 F.Supp.2d 90, 103 (S.D.N.Y. 2003) (same). The instant record does not support the DA defendants' contention that plaintiff's evaluations were so poor that she was on the brink of losing her position. See Seacord Decl., Exhibits G, H, I & J (Plaintiff's Evaluations). The evaluations presented in the record contain above average, average and below average marks, but none contain the lowest rating

possible, i.e., unacceptable. See id. With one exception,[6] none of the evaluations contain any statements that would suggest that plaintiff's position at the DA's Office was in jeopardy. The evaluations, taken as a whole, do not support the DA defendants' contention that even if a causal connection is established by the temporal proximity of plaintiff's complaint to the press to her termination, plaintiff would have been terminated from her job in any event. See also Pl.'s Aff., Exhibit H (Ramotar Aff.); Exhibit J (Rupnarine Aff.), Exhibit K (Yagudaev Aff.) (affidavits from former complaining witnesses at the DA's Office praising plaintiff's advocacy skills).

Finally, the DA defendants contend that plaintiff's behavior at the April 24, 2007 meeting and her failure to return to work that day caused her termination and not her protected speech. Specifically, the DA defendants argue that plaintiff yelled "fire me" and made other outbursts when told that she was being relieved of her three-year commitment. See Ritter Dep. 121; Henigman Dep. 62-63; Quinn Dep. 70-74. Plaintiff claims that she refused to resign or return to her desk to work beside Brad Chain who she believed tested positive for TB. Harris Dep. 74, 78.

An employer can still prevail on summary judgment if it shows that it would have taken the same adverse action even in the absence of the protected speech because an "employee who engages in unprotected conduct [cannot escape] discipline for that conduct by the fact that it was related to protected conduct." Heil v. Santoro, 147 F.3d 103, 110 (2d Cir. 1998) (police officer's insubordination and not his protected speech caused employer's discipline).

---

[6] Plaintiff's last Criminal Court Evaluation dated November 30, 2006, stated in part: "if Tamara continues along this vein, her future outlook as a trial attorney in this office is questionable." Seacord Decl., Exhibit J. However, plaintiff's last Intake Evaluation dated three days earlier on November 27, 2006, while expressing concern about her intake duties, contained no warning about her future at the DA's office. Seacord Decl., Exhibit I.

Although plaintiff may have properly been disciplined for her conduct at the April 24, 2007 meeting, she has raised a genuine dispute of material fact as to whether she would have been fired for her conduct at the meeting or for failing to return to work if she hadn't contacted the press regarding TB. Plaintiff alleges that the DA defendants' reasons for her termination are pretextual. The DA defendants do not dispute that even though plaintiff acted inappropriately at the meeting, she was not fired on the spot for her insubordination, but rather told to return to work. Quinn Dep. 72:20-25, 89. Accordingly, there is a genuine dispute as to whether plaintiff would have been terminated or given a less severe sanction, such as suspension, for her conduct at the meeting had she not reported a TB outbreak at the DA's office to the press. See, e.g., Sims v. City of New York, No. 08 Civ. 5965, 2010 WL 3825720, at *9-10 (S.D.N.Y. Sept. 30, 2010) (denying summary judgment based on whether defendant's reason, insubordination, was or was not pretextual). "If there are significant questions as to whether an employer would have discharged an employee but for his/her speech, summary judgment is precluded." Hale v. Mann, 219 F.3d 61, 70 (2d Cir. 2000). The Court concludes that there are substantial questions and a genuine dispute as to material facts regarding plaintiff's termination. Therefore, the Court recommends that the DA defendants' motion for summary judgment should be denied as to plaintiff's First Amendment retaliation claim.

### B.     Fourteenth Amendment - Due Process

In order to state a violation of due process claim under the Fourteenth Amendment, the Court must first determine whether a protected liberty interest exists and, if so, whether the procedures in place adequately safeguard that interest. Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) (citing Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989)).

Plaintiff alleges that the DA defendants denied her of her "liberty right under the Fourteenth Amendment of the U.S. Constitution to work in an environment that is free of Tuberculosis and contagion." Am. Compl. ¶ 24. Plaintiff relies on cases that involve mentally-ill students and the involuntarily committed at state facilities. See Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239 (2d Cir. 1984); Youngberg v. Rivera, 457 U.S. 307, 315 (1982). The DA Defendants counter that no such constitutionally-protected liberty interest exists. DA Defs. Mem. at 17. The Court agrees with the DA defendants. Plaintiff's reliance on these cases is misplaced and these cases do not support her constitutional claim to a "TB free environment." The Court finds no support in the record or elsewhere for such a broadly defined liberty interest.

In fact, the Supreme Court has declined to extend due process protection to safe working conditions. In Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992), the Court held that substantive due process was not a guarantor of workplace safety: "Neither the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." See also Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006) (affirming dismissal of police officer's due process claims based on an injury sustained in the workplace).

Given the prevalence of individuals who are infected with TB, see Pl. Aff., Exhibit C, Calderon Dep. 24:5-14 ("[it] is estimated that a third of the world['s] population carries [the TB] infection"), it is unlikely that any public building or work environment could meet the standard if substantive due process guaranteed a TB free workplace. Even assuming *arguendo* that plaintiff did have such a right, it is undisputed that the DA defendants followed the procedures

necessary when TB was detected as required by the City's Department of Health and Mental Hygiene. Therefore, the Court recommends that the DA defendants' motion for summary judgment should be granted as to plaintiff's Fourteenth Amendment due process claim.[7]

Plaintiff further argues that the DA defendants prevented plaintiff from practicing her profession. Am. Compl. ¶ 30. As a result, plaintiff alleges that it was "impossible for [her] to practice the profession of law." Am. Compl. ¶ 33.

The Supreme Court has recognized a liberty interest under the Due Process Clause of the Fourteenth Amendment to "some generalized due process right to choose one's field of private employment, but [that right] is nevertheless subject to reasonable government regulation." Conn v. Gabbert, 526 U.S. 286, 291-92 (1999). "State action will only be found unconstitutional if it renders a complete prohibition of the right to engage in a calling, rather than a brief interruption." Id.; see also Rodriguez v. Margotta, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999) ("It is well settled that one must have *no* ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest.").

Notwithstanding that plaintiff provides no support for this claim in opposition to the DA defendants' motion, the Court finds that there is no genuine dispute as to any material fact related to this claim. As set forth below, the Court finds no admissible evidence to support plaintiff's claim that the DA defendants directed court security to activate a security threat alarm or in any other way interfered with her access to the court. See *infra* 24-25. Similarly, the Court finds there is no record evidence to support plaintiff's claim that the DA defendants prevented plaintiff from practicing law.

---

[7] As the Court finds that plaintiff does not have a clearly-established constitutional right to a work in an environment free of TB, the Court need not reach the DA defendants' qualified immunity claim. Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Even if the Court were to construe plaintiff's failure to access the court through the attorney's entrance on May 2, 2007, because she lacked identification, or the incident on May 4, 2007, requesting that plaintiff meet with Abruzzo outside the courtroom, as preventing her from practicing law, these two incidents alone do not implicate a liberty interest under the Fourteenth Amendment. See Rogovin v. N.Y. City Bd. Educ., No. CV-99-3382, 2001 WL 936191, at *7 (E.D.N.Y. Aug. 17, 2001) (holding that plaintiff was not denied the right to practice his chosen profession of teaching because he was "able to teach in any of the 31 school districts in New York City . . . [or] seek employment elsewhere in New York State"); see also Gonzalez v. City of New York, 135 F. Supp. 2d 385, 392 (E.D.N.Y. 2001) (denying a similar claim by doctors who alleged that the City's board certification requirement placed a "'roadblock' in their career path because they were . . . unable to find employment as emergency room doctors"). Therefore, the Court recommends that the DA defendants' motion should be granted regarding plaintiff's Fourteenth Amendment claim regarding her right to practice law.

### C.    First Amendment Claim - Access to the Court

As set forth above, plaintiff's right of access to the courts as a non-party is rooted in the First Amendment which protects access for the public and the press. Richmond Newspapers, 448 U.S. at 573; Hartford Courant Co., 380 F.3d at 91 (citing Westmoreland, 752 F.2d at 23). To establish a violation of the right of access to the courts, a plaintiff must show an "actual injury" caused by the alleged denial of access. Lewis, 518 U.S. at 349-53; Monsky, 127 F.3d at 246.

Plaintiff alleges that the DA defendants ordered court security to activate a "security threat" alarm and to notify them whenever plaintiff showed up at the courthouse. Plaintiff further alleges that on May 2, 2007, defendants Henigman and "either John Ryan o[r] Jim Quinn came downstairs to watch," Pl. Aff. at 41; Harris Dep. 123:4-9, and thereafter, Abruzzo acting

on orders from defendant Ryan had plaintiff removed from a courtroom a few days later. Pl. Aff. at 41-42; Harris Dep. 134-143. The DA defendants argue that plaintiff has not demonstrated any of the DA defendants' personal involvement in the alleged denial of access.

First, plaintiff's recollection that Henigman, Ryan and or Quinn were present when she tried to enter the courthouse on the afternoon of May 2, 2007 is not supported by any testimony of those present such as the attorney Dayan, defendant Hunter, court officer Tursi or court officer Falke. Second, plaintiff points to Abruzzo's testimony to support her claim that he was acting pursuant to defendant Ryan's order to have plaintiff return her DA identification card, <u>see</u> Abruzzo Dep. 13:16-22, and that court officer Tursi stated that Abruzzo asked him to inform the DA's office when plaintiff entered the courthouse, <u>see</u> Tursi Aff. ¶ 7. However, this testimony does not establish that the DA defendants instructed court security to activate a security alarm to prevent plaintiff from entering the courthouse. Instead, the DA defendants' testimony – along with Abruzzo and Tursi's statements – is consistent with their claim that they sought the return of the DA identification that plaintiff admits had not been returned to the DA's Office at that time. Abruzzo Dep. 13:16-22; 16:7-8 ("All I was told was to come down and pick the ID card."); Tursi Aff. ¶ 6-7; <u>see</u> <u>also</u> Harris Dep. 205:5-22 (DA identification returned on May 17, 2007).

Further, as noted above in addressing defendant Hunter's motion, <u>see</u> *supra* 8-11, plaintiff has not produced any admissible evidence that the DA defendants ordered a security alarm or prevented plaintiff from entering the courthouse.

Moreover, plaintiff has failed to demonstrate the personal involvement of any of the DA defendants in depriving plaintiff of her First Amendment rights. As a prerequisite to a damage award under 42 U.S.C. § 1983, a plaintiff must allege the defendant's direct or personal involvement in the alleged constitutional deprivation. "It is well-settled in this Circuit that

personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).  To the extent plaintiff names defendants based on their roles as supervisors, such as Richard Brown, the Queen's County District Attorney, the United States Supreme Court has held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," and rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948-49 (2009).

Here, plaintiff fails to support her allegations against the DA defendants with admissible evidence. Instead, plaintiff relies on her own recollection that Henigman, Quinn and or Ryan were present when she was stopped at the DA entrance and also relies on Abruzzo's testimony that he was told by Ryan to retrieve the DA's identification card from plaintiff when he appeared at the courthouse to show the DA's defendants' personal involvement.  This is not enough to withstand defendants' motion for summary judgment.  Therefore, the Court recommends that the DA defendants' motion for summary judgment should be granted as to plaintiff's First Amendment access-to-the court claim.

### D.  Fourth Amendment Claim - Unreasonable Search and Seizure[8]

Plaintiff claims that the DA defendants violated her Fourth Amendment right to be free from unreasonable seizures when they directed Hunter to detain and exclude her from the

---

[8]  This claim was dismissed against defendant Hunter.  See Docket Entry #28.  Therefore, the Court only addresses plaintiff's Fourth Amendment claim as to the DA defendants.

courthouse.  Am. Compl. ¶ 30.  Plaintiff also alleges that throughout May 2007 she was "harassed each and every time [she] entered the Queens Criminal Courthouse, security alerts were activated, and [she] was surrounded by court officers."  Am. Compl. ¶ 33.

Neither side provides support for or against this claim.  The DA defendants rely on my Report and Recommendation dismissing the Fourth Amendment claim against defendant Hunter, Defs. Mem. at 19, n.5, and plaintiff provides no further support for this claim stating "[s]ince Seacord makes no further argument on this point, I will not belabor the issue any further."  Pl. Aff. at 44.

 Not every interaction between citizens and the police constitutes a seizure under the Fourth Amendment.  "A Fourth Amendment seizure occurs where a police officer 'briefly detains an individual and restrains that person's right to walk away.'"  <u>Palmieri v. Town of Babylon</u>, No. 06-CV-0968, 2008 WL 315515, at *12 (E.D.N.Y. Aug. 4, 2008) (quoting <u>United States v. Moreno</u>, 897 F.2d 26, 30 (2d Cir. 1990)).  More specifically, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980); <u>see also</u> <u>California v. Hodari D.</u>, 499 U.S. 621, 624 (1991) (refining the <u>Mendenhall</u> rule to require "either physical force [or] . . . *submission* to the assertion of authority") (emphasis in original).  In making the determination of whether a reasonable person would have believed that he was not free to leave, courts may look at "the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; [and] language or tone indicating that compliance with the officer was compulsory . . . ." <u>United States v. Glover</u>, 957 F.2d 1004, 1008 (2d Cir. 1992).  The Fourth Amendment only protects against "*unreasonable* searches and seizures of (among other things)

the person." Virginia v. Moore, 553 U.S. 164, 168 (2008) (emphasis added). Further, "[r]easonableness . . . is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996).

Here, there is no record evidence that the DA defendants detained plaintiff. Furthermore, defendant Hunter denied that she was ordered by the DA defendants to detain plaintiff. Hunter Aff. ¶¶ 14-17; see also Henigmen Dep. 94:12-95:20; Ritter Dep. 173:16-174:10; Quinn Dep. 114:3-17; 140:8-22; Ryan Dep. 107:24-109:6.

Instead, the record reflects that the DA defendants requested that Abruzzo retrieve plaintiff's DA identification card. Abruzzo Dep. 22-27. Plaintiff was asked to come out of the courtroom AP3 on May 7, 2007 and Abruzzo asked for the ID card; plaintiff said she didn't have it. Abruzzo Dep. 26, 35. The encounter lasted two minutes. Abruzzo Dep. 37. After, Abruzzo walked away. Abruzzo Dep. 44. There is no genuine dispute as to any material fact regarding plaintiff's Fourth Amendment claim. The DA defendants' motion for summary judgment should be granted as to plaintiff's Fourth Amendment claim.

### E.    Conspiracy Claim[9]

Plaintiff's amended complaint alleges that defendant Hunter conspired with the DA defendants to violate her constitutional rights. Am. Compl. ¶¶ 42-70. To state a conspiracy claim under 42 U.S.C. § 1985, a plaintiff must allege: (1) some racial or other class-based discriminatory animus underlying the defendants' actions; and (2) that the conspiracy was aimed at interfering with the plaintiff's protected rights. Bray v. Alexandria Women's Health Clinic,

---

[9] This claim was dismissed against defendant Hunter. See Docket Entry #28. Therefore, the Court only addresses plaintiff's conspiracy claim as to the DA defendants.

506 U.S. 263, 268 (1993); <u>Gagliardi v. Village of Pawling</u>, 18 F.3d 188, 194 (2d Cir. 1994).

Further, to successfully plead conspiracy, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." <u>Webb v. Goord</u>, 340 F.3d 105, 110 (2d Cir. 2003) (citing <u>Romer v. Morgenthau</u>, 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000).

Here, plaintiff has not demonstrated any racial or other class-based discriminatory animus underlying the DA defendants' actions. Furthermore, plaintiff has not demonstrated by admissible evidence the requisite meeting of the minds. All the DA defendants testified that they had no contact with Hunter involving plaintiff and they all deny requesting Hunter to detain and or prevent plaintiff from entering the courthouse. <u>See</u> Henigmen Dep. 94:12-95:20; Ritter Dep. 173:16-174:10; Quinn Dep. 114:3-17; 140:8-22; Ryan Dep. 107:24-109:6; <u>see also</u> Hunter Aff. ¶¶ 14-17. Aside from conclusory allegations, plaintiff has not provided any admissible record evidence to contradict defendants' position. As there is no genuine dispute as to any material fact, the Court recommends that the DA defendants' motion for summary judgment should be granted as to plaintiff's conspiracy claim.

**F.     State Law Claims**

**(1) Defamation**

As set forth above, the elements of a defamation claim are "(1) that defendants made a false defamatory statement of fact; (2) that the statement was published to a third party; (3) that the statement concerned the plaintiff; (4) that the defendant was responsible for making the statement; and (5) that the statement was slander *per se* or caused special damages. <u>Baez</u>, 745

F.Supp.2d at 225. Special damages are defined as "the loss of something having economic or pecuniary value," Liberman, 80 N.Y.2d at 434-35, and "must be fully and accurately stated, with sufficient particularity to identify actual losses." Jin Yung Chung, 2011 WL 1298891 at *6.

The bulk of plaintiff's defamation claim centers around conduct and speech attributed to defendant Hunter, see Pl. Am. Compl. ¶¶ 72-75, 81, and Hunter has moved for summary judgment on this claim. The Court has recommended that Hunter's motion for summary judgment should be granted. See *supra* 12-14.

Plaintiff's defamation claims against the DA defendants consist of the following: (i) that the DA defendants "started disseminating rumors to court officers that I was an inept lawyer," Am. Compl. ¶ 76, (ii) that defendant Ritter contacted a former complaining witness and "stated to him that I was not a competent attorney," Am. Compl. ¶ 77, (iii) that the DA defendants "disseminated my photograph to all court officers and court personnel, stating I was a security threat . . .," Am. Compl. ¶ 78, (iv) that the DA defendants notified prosecutors at the Queens DA's Office that plaintiff was a security threat and disseminated her photograph, Am. Compl. ¶ 79, and (v) that defendant Quinn "urged [Dayan] to terminate his employment relationship with [plaintiff] . . . and threatened [Dayan] with retaliation]," Am. Compl. ¶ 80.

Plaintiff's opposition relies primarily on defendant Ritter's conversation with a former complaining witness, Alexander Yagudaev ("Yagudaev") and provides his affidavit. Plaintiff argues that defendant Ritter defamed her by making a statement to Yagudaev that she was fired from her position at the DA's office because she was "no good." Pl. Aff. at 44. According to Yagudaev, defendant Ritter "attempted numerous times to convince me that Queens DA has

plenty of DA's better than Tammy. And Ms. Harris was not that good, otherwise she would still be a prosecutor there." Pl. Aff, Exhibit K, Yagudaev Aff. at ¶ 8. Defendant Ritter testified that she did not recall the conversation. Pl. Aff., Exhibit E, Ritter Dep. 73:15-74:17.

Further, plaintiff argues that as to the remaining defamation claim against the DA defendants, her "sworn testimony on this issue constitutes admissible evidence" of defamation. Pl. Aff. at 46. Plaintiff's reliance on statements made to her by another prosecutor, Kristina Sapaskis, is not supported by an affidavit or deposition testimony and therefore it is inadmissible. See Equal Employment Opportunity Commission, 2011 WL 3599934 at *4, n.6. Court officers Tursi and Falke, along with defendant Hunter, deny that they were told plaintiff was a security threat or shown her photograph and attorney Dayan denies that he severed his employment relationship with plaintiff based on any defamatory statements by the DA defendants. Tursi Aff. ¶¶ 13, 16; Falke Aff. ¶¶ 6, 10-13; Hunter Aff. ¶¶ 14-17; Dayan Dep. 20:10-13, 24:19-25.[10]

Accordingly, the only defamation claim that remains is against defendant Ritter. The Court must make the threshold determination as to whether the statement at issue is susceptible of one or many meanings and whether that meaning is defamatory as a matter of law. Van Buskirk v. The New York Times Co., 325 F.3d 87, 90 (2d Cir. 2003); Davis v. Ross, 754 F.2d 80, 82 (2d Cir. 1985). In making this determination, the Court employs "an objective standard"

---

[10] The record reflects that Dayan and plaintiff were brought up on a grievance and reprimanded when plaintiff appeared for a defendant represented by Dayan where plaintiff was formerly the assigned prosecutor on the case. See Seacord Decl., Exhibit R (Memorandum dated May 3, 2007, to All Assistant District Attorneys); Exhibit S (DA's Office Letter dated May 9, 2007 to the Grievance Committee for the Second and Eleventh Judicial Districts); see also Dayan Dep. 19-21, 36.

and considers "whether an ordinary person would find the statement reasonably susceptible of a defamatory connotation." <u>Davis</u>, 754 F.2d at 83 (citation omitted). Slander is less actionable than libel, since a written statement "is more lasting." <u>Id.</u> at 85; <u>see also</u> <u>Haugh v. Schroder Investment Management North America Inc.</u>, No. 02 Civ. 7955, 2003 WL 21136096, at *2 (S.D.N.Y. May 15, 2003).

Here, the Court concludes that the statement that plaintiff "was not that good" does not rise to the level of defamation. "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." <u>See</u> <u>Dillon v. City of New York</u>, 261 A.D.2d 34, 38 (1st Dep't 1999) (dismissing defamation action by former assistant district attorneys who had been terminated); <u>see</u> <u>also</u> <u>Aronson v. Wiersma</u>, 65 N.Y.2d 592 (1985). Plaintiff has failed to show there is a genuine dispute as to any material fact regarding her defamation claims against the DA defendants. Therefore, the Court recommends that the DA defendants' motion for summary judgment should be granted as to plaintiff's defamation claim.[11]

### (2)  Tortious Interference Contract Claim[12]

Plaintiff's amended complaint alleges that defendant Quinn "procured Albert Dayan's breach of our employment contract and lease agreement." Am. Compl. at ¶ 90. Defendant Quinn denies that he knew an employment contract existed and he denies interfering with plaintiff's lease agreement. Quinn Dep. 124-26, 139-41.

---

[11]  As plaintiff fails to satisfy the elements of a defamation claim, the Court need not address defendants' argument regarding qualified privilege.

[12]  This claim was dismissed against defendant Hunter. <u>See</u> Docket Entry #28. Therefore, the Court only addresses plaintiff's tortious interference claim as to the DA defendants.

In order to state a claim for tortious interference, a plaintiff must demonstrate "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006) (citation and internal quotation marks omitted).

As set forth earlier, Dayan testified that he did not have an employment contract with plaintiff. Dayan Dep. 7:12-18. Dayan further testified that he was not pressured by the DA's office to sever his relationship with plaintiff, but just realized that it would not work out. Dayan Dep. 20:10-13; 22:21-24:25. As to plaintiff's lease, Dayan testified that he offered to rent plaintiff space in his suite. Dayan Dep. 8:2-4. Defendant Quinn testified that Dayan called him and indicated that he had signed a lease with plaintiff and Quinn "said that it would not be a problem," Quinn Dep. 124:14-25, but in light of the grievance filed against Dayan and plaintiff, "he was trying to get out of a one year lease he had signed with [plaintiff]." Quinn Dep. 128:4-14. Nothing in the record supports plaintiff's contention that Quinn or any other DA defendant interfered with plaintiff's employment and lease agreement with Dayan. Rather, the record points to the grievance filed against Dayan and plaintiff as the impetus for the breakdown between them. There is no genuine dispute as to any material fact regarding this claim and the DA defendants' motion for summary judgment should be granted as to plaintiff's state law tortious interference claim.

### (3) Intentional Infliction of Emotional Distress[13]

Finally, plaintiff's amended complaint alleges that the DA defendants intentionally inflicted emotional distress. Am. Compl. ¶¶ 93-94. The four elements of an intentional infliction of emotional distress claim under New York law: a plaintiff must show: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the emotional distress; and (4) severe emotional distress. Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993)). New York law sets a very high threshold for "extreme and outrageous conduct." Extreme and outrageous conduct is conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Id. (quoting Murphy v. American Home Products Corp., 58 N.Y.2d 293, 303 (1983)); see also Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). "Ordinarily, whether the challenged conduct is sufficiently outrageous will be determined as a matter of law." Rizzo v. Edison, Inc., 172 Fed. Appx. 391, 396 (2d Cir. 2006) (quoting Nevin v. Citibank, N.A., 107 F.Supp.2d 333, 345-46 (S.D.N.Y. 2000)).

Plaintiff's recounts her humiliation at being denied access to the courthouse at the DA entrance in front of Dayan, of being asked to leave the courtroom in front of a client; and of being laughed at by defendant Henigman. Am. Compl. ¶¶ 93-94. In her opposition, plaintiff includes her termination and "ruining [her] career" as examples of the DA defendants' outrageous conduct, but does not elaborate further. Pl. Aff. 48-49.

---

[13] This claim was dismissed against defendant Hunter. See Docket Entry #28. The Court only addresses plaintiff's intentional infliction of emotional distress claim as to the DA defendants.

Even in the light most favorable to plaintiff, none of the conduct plaintiff attributes to the DA defendants is sufficiently extreme or outrageous to demonstrate an intentional infliction of emotion distress. See, e.g., Johnston v. Port Authority of New York and New Jersey, No. 09-CV-4432, 2011 WL 3235760, at *12 (E.D.N.Y. Jul. 28, 2011) (declining to find defendant's post inspection and arrest of plaintiff, which was later dismissed, sufficiently outrageous); Stamm v. New York City Transit Authority, No. 04-CV-2163, 2011 WL 1315935, at *32 (E.D.N.Y. Mar. 30, 2011) (declining to find that defendant's failure to ensure that vehicles and facilities are accessible to persons with disabilities who utilize service animals was sufficiently outrageous). Moreover, "[t]ermination of at-will employment 'may not form the basis of an intentional infliction of emotional distress cause of action.'" Baraliu v. Vinya Capital, L.P., No. 07 Civ. 4626, 2009 WL 959578, at *12 (S.D.N.Y. Mar. 31, 2009) (quoting Bailey v. New York Westchester Sq. Med. Ctr., 38 A.D.3d 119, 125, 829 N.Y.S.2d 30, 35-36 (1st Dep't 2007)); see also Fama v. Am. Int'l Group, Inc., 306 A.D.2d 310, 311-12, 760 N.Y.S.2d 534, 536 (2d Dep't 2003). Therefore, the Court recommends that the DA defendants' motion for summary judgment should be granted on plaintiff's state law intentional emotional infliction of distress claim.

**G.      Claims Against the Queens County District Attorney's Office**

The DA defendants also move for summary judgment as to any claim against the Queens DA's Office arguing that it is not a suable entity. See Defs. Mem. at 28 (citing Woodward v. Office of the DA, 689 F.Supp.2d 655, 658 (S.D.N.Y. 2010). Plaintiff does not oppose this argument.

"The capacity of the [Queens DA's] Office to be sued is determined by New York law, . . . and under New York law, the [Queens DA's Office] does not have a legal existence separate from the District Attorney."  White v. Vance, No. 10 Civ. 6142, 2011 WL 2565476, at *4 (S.D.N.Y. June 21, 2011) (quoting Woodward, 689 F.Supp.2d at 658 (internal quotation omitted)).  Furthermore, agencies of the State of New York are entitled to immunity under the Eleventh Amendment.  In re Deposit Ins. Agency, 482 F.3d at 617 ("arm[s] of the State" are immunized from suit) (internal quotation marks omitted).  Since plaintiff seeks damages against the Queens DA's Office, an agency of the State of New York, see Ying Jing Gan, 996 F.2d at 530, plaintiff's claims are barred by the Eleventh Amendment.  See also Pennhurst State Sch. & Hosp., 465 U.S. at 100; Woodward, 689 F.Supp.2d at 659; White, 2011 WL 2565476, at *4.  Thus, to the extent plaintiff seeks to sue the Queens County DA's Office, the Court recommends that the DA defendants' motion for summary judgment dismissing any claims as to the Queens County DA's Office should be granted.

## CONCLUSION

Accordingly, it is respectfully recommended that defendant Hunter's summary judgment motion should be granted and the DA defendants' summary judgment motion should be granted in part and denied in part.  Specifically, defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim against the DA defendants should be denied; defendants' motions regarding all of the other claims should be granted.  Only plaintiff's First Amendment retaliation claim under 42 U.S.C. § 1983 against the DA defendants should proceed.

## FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital District Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).


_____/S/_____
LOIS BLOOM
United States Magistrate Judge

Dated: September 1, 2011
       Brooklyn, New York