UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
TAMARA M. HARRIS,

        Plaintiff,

   -against-

QUEENS COUNTY DISTRICT ATTORNEY'S
OFFICE; RICHARD BROWN, ESQ., individually
and as District Attorney of Queens County;
JOAN RITTER, ESQ., individually and as a Bureau
Chief of the Criminal Court Bureau of the Queens
County District Attorney's Office; JOHN RYAN, ESQ.,
individually and as Senior Executive Assistant District
Attorney; JIM QUINN, ESQ., individually and as
Senior Executive Assistant District Attorney; LAURA
HENIGMAN, individually and as Bureau Chief of
the Intake Bureau at the Queens County District
Attorney's Office; and LIEUTENANT STEPHANIE
HUNTER, individually and as Lieutenant of the Unified
Court System/Office of Court Administration,

       Defendants.
--------------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
08-cv-1703 (CBA)

**AMON, Chief United States District Judge**.

## INTRODUCTION

 Plaintiff Tamara Harris, proceeding *pro se*, filed this action under 42 U.S.C. § 1983 and

§ 1985 against Lieutenant Stephanie Hunter, a state-employed court officer, and the Queens

County District Attorney's Office ("Queens DA"), Richard Brown, Joan Ritter, Jim Quinn, John

Ryan, and Laura Henigman (collectively "DA Defendants"). Before the Court is the Report and

Recommendation of Magistrate Judge Lois Bloom granting Defendant Stephanie Hunter's

motion for summary judgment and granting in part and denying in part the DA Defendants'

motion for summary judgment.  The Court declines to adopt the recommendation that Hunter's

motion be granted and adopts the recommendation to grant in part and deny in part the DA Defendants' motion.

## BACKGROUND

The Court assumes the parties' familiarity with the record and with the facts and procedural history as set forth in the Report and Recommendation, which is incorporated by reference. It elaborates only as necessary to the below discussion.

## DISCUSSION

*I.    Standard of Review*

*A.   Review of a Report and Recommendation*

In reviewing a Report and Recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The court must make a *de novo* determination of those aspects of the Report and Recommendation to which a party has filed objections. *Id.*

To adopt portions of the Report and Recommendation to which no party has objected, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, 2009 WL 2001439, at *4 (S.D.N.Y. 2009) (internal quotation marks omitted). Moreover, where the party "makes only conclusory or general objections, or simply reiterates [his] original arguments, the Court reviews the Report and Recommendation only for clear error." *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 366 (S.D.N.Y. 2007).  A ruling is clearly erroneous when "upon review of the entire record, [the reviewing court is] left with the definite and firm conviction that a mistake has been committed." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339-40 (S.D.N.Y. 2009).

### B.  Summary Judgment Standard

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Accordingly, "[t]he trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### II.    Lieutenant Hunter's Motion for Summary Judgment

Harris's amended complaint, filed on September 4, 2008, asserts against Hunter claims for violation of the First, Fourth, and Fourteenth Amendments as well as state law claims for defamation, tortious interference with contract, and intentional infliction of emotional distress. *See* Am. Compl., D.E. # 17.  Hunter moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), D.E. # 19, and this Court adopted Magistrate Judge Bloom's Report and Recommendation, which recommended that the Court grant the Motion as to all but two of these claims. *See* D.E. # 27, 28.  The remaining claims against Hunter allege (a) denial of the constitutional right of access to the courts; and (b) state law defamation.

### A.  Denial of Access to the Court

Harris's first remaining claim against Hunter is for denial of her constitutional right of access to the court. This claim arises from Hunter's alleged exclusion of Harris from the Queens

Criminal Courthouse on May 2, 2007.  By that date, Harris's employment at the Queens DA had

been terminated, and she was working under some semi-formal arrangement with a private

practitioner, Albert Dayan.  When Harris attempted to enter through a lawyers-only entrance

without proper identification, she was refused entry.

The Magistrate Judge recommended summary judgment on this claim on two independent

grounds.  First, she found that "other than [Harris's] own deposition testimony, [Harris] provides

nothing to support her First Amendment claim that Hunter denied her access to the Court."

R & R at 10.  The Magistrate found that all other evidence in the record suggested that Harris

was simply denied access through one entrance for which she lacked the required credential.

The second ground upon which the Magistrate Judge recommended summary judgment was that

even if Harris was barred from the courthouse, "she has not shown that she sustained an actual

injury from the denial." *Id.* (relying upon *Lewis v. Casey*, 518 U.S. 343, 349-53 (1996), and

*Cathedral Church v. Inc. Village of Malverne*, 353 F. Supp. 2d 375, 388 (E.D.N.Y. 2005)).

### i. Denial of Access

Harris has filed objections to the Magistrate Judge's first ground for recommending summary

judgment.  The Court's review is therefore *de novo*.  Both Harris's objections and Hunter's reply

assume that the Magistrate Judge applied Local Civil Rule 56.1(c) to her claim.  This is a fair

assumption, because although the Magistrate did not invoke the rule explicitly in her discussion

of the access to the court claim, she did rely upon that rule in setting forth the facts, *see* R&R at 2

n.1.

First, Rule 56.1(a) required Hunter, the moving party, to include a "short and concise

statement, in numbered paragraphs, of the material facts as to which the moving party contends

there is no genuine issue to be tried."  Hunter filed such a statement.  Rule 56.1(b), in turn,

required Harris, the opposing party, to "include a correspondingly numbered paragraph responding to each numbered paragraph in the [Rule 56.1(a) statement . . . ." Hunter failed to file such a statement. Accordingly, by operation of Rule 56.1(c), each statement in Hunter's Rule 56.1 statement is deemed admitted. And indeed, these statements allege that Hunter merely prevented Harris from entering the courthouse through an entrance for which she lacked proper authorization.

Harris correctly points out that "where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). She expands this principle to contend that the Magistrate Judge should also have conducted an independent review of the record to look for contrary facts even if the record did support the assertions in Hunter's Rule 56.1 statement. Such a review, Harris argues, would reveal genuine dispute between Harris's deposition testimony—which alleges that she was "forcefully stopped upon entering the courthouse, . . . advised by the court officer at the entrance that [she] was banned from the building and that [she] would be prohibited from entering whenever [she] tried to get inside, and that a security alert was activated . . . resulting in 15 armed guards surrounding [her]"—and the other evidence in the record. Harris Objs. A, D.E. #98, at 2.

As a formal matter, Harris's objections are without merit. The Magistrate Judge's application of Rule 56.1 was well within the Rule's letter. The Magistrate Judge verified that each statement admitted from Hunter's Rule 56.1 statement had support in the record. This is therefore not, as Harris contends, a case in which application of the Rule "absolve[s] the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of

law," *Holtz*, 258 F.3d at 74.  Were this Court reviewing the Magistrate Judge's ruling for clear error, it would not find any.

Nonetheless, the Court is troubled by the application of Rule 56.1 in this particular instance. The Second Circuit has made clear that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Id.* at 73.  For two reasons, the Court finds it appropriate to exercise this discretion.  First, the parties' versions of the events are in stark relief.  Harris has forcefully asserted in both her amended complaint and her deposition that she was stopped, Am. Compl. ¶ 30; Harris Dep. at 113; that she was advised that she was barred completely from entering the courthouse through any entrance, Am. Compl. ¶ 30; Harris Dep. at 121-22, 124; that Hunter, at the direction of the Queens DA, activated a security alert, Am. Compl. ¶ 30; Harris Dep. at 113-14; and that she was then surrounded by a large number of armed guards, Am. Compl. ¶ 30; 121-22.  The other witnesses' testimony suggests that Hunter told Harris only that she had to enter through the public entrance, Dayan Dep. at 12-13, 33; Hunter Aff. ¶ 13, that no security alert was activated, Hunter Aff. ¶¶ 14-15, and that the number of guards Harris alleges were present is greatly exaggerated, Tursi Aff. ¶ 11.

Second, these factual disputes were amply addressed in the parties' briefings.  Both Harris and Hunter carefully catalogued the allegations contained in the depositions and affidavits accompanying their papers.  Despite the lack of a responsive Rule 56.1 statement, Harris's Memorandum in Opposition addresses Hunter's version of the facts head-on and with specificity, and each factual point of departure contains a cite to the record.  As such, Harris's non-compliance with Rule 56.1 does not seriously undermine the rule's purpose of "streamlin[ing] the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties," *Holtz*, 258 F.3d 62.

6

Given the above, the Court exercises its discretion to forgive Harris's procedural default, and finds that Harris's deposition testimony is itself sufficient to raise a genuine issue of material fact concerning whether Harris was denied access to the courthouse through any entrance.

*ii. Actual Injury*

The Magistrate Judge further concluded that summary judgment should be granted because Harris failed to show that she suffered "actual injury" from being denied entry to the courthouse, and to the proceeding she came to attend. Review of this claim is under the clear error standard since Harris failed to object to this finding.

The constitutional foundation of denial of access claims is somewhat unsettled. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (noting "unsettled . . . basis of the constitutional right of access to courts"). Application of this right to different factual scenarios remains difficult. Having reviewed the relevant case law including the authorities on which the Magistrate Judge relied, the Court is constrained to conclude that it was clear error to require Harris to demonstrate injury in addition to the injury of having been excluded from the proceedings.

The understandable confusion arises from the distinction between a right of access claim grounded in a litigant's right to get a case before the court, the case law on which the Magistrate Judge relied, *see* R & R at 10, and a right of access claim grounded in the public and press's right to attend criminal and civil proceedings, the law applicable to Harris's claim, *see, e.g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986); *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16 (2d Cir. 1984); *Huminski v. Corsones*, 386 F.3d 116, 144-46 (2d Cir. 2004). The formulation of the "actual injury" principle relied upon by the Magistrate Judge was first recognized in *Lewis v. Casey*, 518

U.S. 343, 349 (1996), a case that addressed litigants' access to the courts. *Lewis* was a class action brought by inmates in various prisons. The inmates claimed that their respective prison law libraries were inadequate, under *Bounds v. Smith*, 430 U.S. 817, 822 (1977), "to insure that inmate access to the courts is adequate, effective, and meaningful." The Supreme Court held that "an inmate alleging a violation of *Bounds* must show actual injury." *Lewis*, 518 U.S. at 349. This requirement, the Court reasoned, "derives ultimately from the doctrine of standing." *Id.* "Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* Instead, "the inmate . . . must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.*

But Harris does not assert the right addressed in *Lewis*, which is "variously located in the First Amendment right to petition for redress, the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments," *Monsky v. Moraghan*, 127 F.3d 242, 246 (2d Cir. 1997). *See* R & R on Hunter's Motion to Dismiss at 10-11; *see generally Huminski*, 386 F.3d at 146 n.31 (recognizing distinct rights of access). Rather, Harris's claim sounds in the right of the public and press to attend criminal trials which was first explicitly recognized in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). In *Richmond Newspapers*, the Court explained that

> [t]he right of access to places traditionally open to the public, as criminal trials have long been, may be seen as assured by the amalgam of the First Amendment guarantees of speech and press; and their affinity to the right of assembly is not without relevance.

448 U.S. at 577. The Supreme Court has since recognized that the right to be physically present extends to preliminary criminal proceedings, *see Press-Enterprise Co.*, 478 U.S. 1, and the

Second Circuit and other courts have extended the right to civil proceedings, *see Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, and to access to certain court documents, *see Hartford Courant v. Pellegrino*, 380 F.3d 83, 91-92 (2d Cir. 2004).

The Court has found no case which applies *Lewis*'s formulation of actual injury to the distinct right of access recognized in *Richmond Newspapers* to require a showing of some injury additional to that which accompanies exclusion. In the bulk of the cases cited by the R & R and Hunter, the right at issue was an individual's right of access to the court as a litigant, not the right of access guaranteed to the press or general public. *See Lewis v. Casey*, 518 U.S. 343 (burden on inmates filing legal papers); *Christopher*, 536 U.S. 403 (alleged concealment of information necessary to file legal claim); *Monsky v. Moraghan*, 127 F.3d 243 (2d Cir. 1997) (interference with ability to use Clerk's Office to research pending action); *Cathedral Church of the Intercessor v. Inc. City of Malverne*, 353 F. Supp. 2d 375 (E.D.N.Y. 2005) (defendants "attempted to coerce Plaintiffs' counsel from discontinuing his representation"); *Colondres v. Scoppetta*, 290 F. Supp. 2d 376 (E.D.N.Y. 2003) (potential chilling effect of New York City's lien on plaintiff's recovery); *Cancel v. Goord*, 2001 WL 303713 (S.D.N.Y. 2001) (interference with inmates filing grievances and actions by legal mail); *Doe v. Green*, 593 F. Supp. 2d 523 (W.D.N.Y. 2009) (actions during grand jury investigation interfered with ability to pursue claim).

This is not to suggest that a plaintiff alleging a violation of the right of access recognized in *Richmond Newspapers* need not establish a non-*de minimis* constitutional injury. When a plaintiff asserts a deprivation of the right to physical access to criminal proceedings, however, a sufficient deprivation of physical access *is* the actual injury. *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994), a Second Circuit case that rejected a claim alleging deprivation of the right of

physical access to criminal proceedings, is not to the contrary.  In that case, the court rejected Sheppard's claim despite certain limitations on Sheppard's access—for example, "directing Sheppard to examine court files outside of the courtroom" and "admonishing [Sheppard] to stop using the courtroom as a 'revolving door' when Sheppard went in and out of Beerman's courtroom during a calendar call," *id.* at 152-53—because he was still "allowed to examine files outside of Beerman's courtroom and . . . he was permitted to listen to cases as long as he did not disrupt . . . courtroom proceedings or waste the court's time." *Id.*  Here, Harris alleges that she was completely denied entry to a proceeding in which she was a participant, clearly a non-*de minimis* deprivation.

Because the Court finds summary judgment inappropriate on either of the grounds relied upon by the Magistrate, the motion is denied with respect to Harris's denial of access claim.

### iii. Qualified Immunity

The Magistrate Judge did not reach the question of qualified immunity because she found no deprivation of a constitutional right.  It is now necessary to reach this question.

"A government official is entitled to qualified immunity for his actions unless his conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Rivers v. Fischer*, 390 F. App'x 22, 23 (2d Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).  In this Circuit, "a right is clearly established for qualified immunity purposes if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that [her] conduct was unlawful." *Id.* (original quotation marks omitted).  Although it is true that "this inquiry must be undertaken in light of the specific context of the case," it is also true that generalized constitutional standards may, "in an obvious case, . . . clearly establish

the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

In her motion papers, Hunter argues that Harris "fails to set forth the violation of any clearly established constitutional right . . . ." Hunter Mem. at 15.  The Court disagrees.  By May 2007, the Supreme Court and Second Circuit had clearly recognized the press and public's First Amendment right of access to the court, *Richmond Newspapers, Inc.*, 448 U.S. at 580; *Press-Enterprise Co.*, 478 U.S. at 7-10; *Huminski*, 386 F.3d at 143, and the Second Circuit had sketched the parameters of that right in *Huminski*, 386 F.3d at 143-47 and *Hartford Courant*, 380 F.3d at 91-92; *see also Sheppard v. Beerman*, 18 F.3d 147, 152 (2d Cir. 1992).

Although there is little Supreme Court or Second Circuit case law addressing the full physical exclusion of a member of the public from a courthouse when that individual has the avowed purpose of attending a criminal proceeding, *see Huminski*, 386 F.3d at 145 (noting the lack of case law on "the exclusion of an identified individual member of the public or press"), this is the sort of "obvious case" in which general principles suffice. *See Brosseau*, 543 U.S. at 199.  Whatever the precise parameters of the right recognized in *Richmond Newspapers* and progeny, those cases clearly establish that when an individual arrives at a courthouse to attend a criminal proceeding, a court security official may not affect a complete physical exclusion of that individual unless the exclusion is justified by a "substantial reason" and is narrowly tailored to that purpose. *Huminski*, 386 F.3d at 149-50.  Put more simply, a reasonable defendant in May 2007 would have understood that it is unlawful to bar an individual from attending a criminal proceeding for no good reason.

As discussed *supra*, Harris's deposition testimony constitutes admissible evidence from which a juror could conclude that Hunter barred Harris from the courthouse on May 2, 2007.

And the account given by Hunter herself—who, of course, flatly denies that she excluded Harris from the courthouse or had any reason to do so—suggests no justification for this bar.  Hunter claims that she was advised prior to the May 2 incident by Sgt. Craig Abruzzo of the Queens DA that Harris had been terminated but had not returned her ID. Hunter Dep. at 9, 13-14.  She avers that Abruzzo wished to be notified if Harris attempted to enter the courthouse. *Id.* at 46.  And she claims that when Harris arrived she was called by Lt. Robert Falke, that she responded and observed Harris with Albert Dayan, and that she "thought perhaps it was Mr. [Dayan] that [was] being insistent that [Harris] come in that way because [Harris was] with him." *Id.* at 31-32, 49-50.  She was never advised that Harris was a security threat. *Id.* at 46.

Harris's exclusion from, as she claims, the entire building was therefore wholly unjustified.  Hunter argues that because she was merely confirming another officer's decision not to allow Harris to enter through the lawyers-only entrance, she "could not have understood that . . . she was violating a clearly established constitutional right." *Id.*  If these facts were not in dispute, Harris might have a compelling argument.  But they are in dispute.  Harris claims that Hunter barred her from the entire courthouse.  Hunter is therefore not entitled to qualified immunity.

Similarly, the Court cannot accept Hunter's argument that to the extent Hunter's behavior was motivated by an "argument or uproar at the attorney entrance," Hunter was "entitled to maintain security, dignity and decorum," *id.*  Again, what precisely happened is disputed.  What Hunter did and why she did it are questions for the jury, not the Court. *See Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (although "a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the factfinder").

In reaching this conclusion, the Court does not reject Hunter's assertion that the security, dignity, and decorum of the court are substantial interests. They certainly are. *See Huminski*, 386 F.3d at 140. Nor does the Court suggest that a physical exclusion of limited duration is never an appropriately tailored means of furthering that interest. The Court is mindful that court security officers must often make swift decisions based on rapidly developing events, leaving little time for deliberation or explanation. But because of the disputed facts in this record—particularly whether Harris was barred completely from the courthouse or instead merely required to enter through the public entrance—the Court cannot resolve on summary judgment whether Hunter's conduct was appropriate tailored to these interests.

Because there are genuine issues of material fact that pertain to whether Hunter violated Harris's constitutional right of access and whether Harris is entitled to qualified immunity, the Court declines to accept the Magistrate Judge's recommendation and instead denies the motion for summary judgment.[1]

### B. State Law Defamation

Harris's other remaining claim against Hunter is for defamation under New York state law. This claim alleges that Hunter identified Harris as a security threat to several court officers and to Albert Dayan. Am. Compl. ¶¶ 73, 74. The Magistrate Judge recommended summary judgment, finding that Harris has failed to point to admissible evidence in the record from which a reasonable jury could conclude that Hunter actually made the alleged statement. Harris has filed objections, so the Court's review is *de novo*.

---

[1] With respect to the Magistrate Judge's recommendation on Harris's claim for prospective relief, to which Harris has not objected, the Court finds no clear error. The finding is therefore adopted and summary judgment is granted as to Harris's claims for prospective relief.

To establish a defamation claim under New York law, a plaintiff must establish "(1) that defendants made a false defamatory statement of fact; (2) that the statement was published to a third party; (3) that the statement concerned the plaintiff; (4) that the defendant was responsible for making the statement; and (5) that the statement was slander per se or caused special damages." *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 225 (E.D.N.Y. 2010) (citing *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001)).

### i.   Admissibility of Harris's Deposition Testimony

The only potentially admissible evidence Harris points to in support of her allegations is her own deposition testimony that Vincent Tursi, a court security officer, told her that Hunter had told him that Harris was a security threat.  Tursi denies this. Tursi Aff. ¶¶ 11, 16.

This testimony consists of two alleged statements: (a) Hunter's statement to Tursi that Harris was a security threat; and (b) Tursi's statement to Harris that Hunter made the "security threat" statement to him.  The Court may consider Harris's deposition testimony only if each of these statements is independently admissible.   *See* Fed. R. Civ. P. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."); *Evans v. Port Auth. of N.Y.*, 192 F. Supp. 2d 247, 262 (S.D.N.Y. 2002).

The first statement—Hunter's alleged comment that Harris was a security threat—poses no hearsay problem because it is not offered for its truth.  The same cannot be said, however, for the second statement.  Harris relies upon this statement to establish that Hunter in fact made her statement to Tursi.  It is therefore an unsworn assertion relied upon for its truth, and Harris must establish a ground for its admission.

Harris has made several arguments in favor of the statement's admissibility, but only one arguably has merit. Harris argued in both her motion papers and objection that the statement is admissible under Fed. R. Evid. 801(d)(2)'s party admission provisions because it is "offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Harris Opp. at 17-18. The application of this rule was not fully addressed by the parties.

Without adequate briefing, the Court cannot conclude that Tursi is not Hunter's agent, or that his statement was not within the scope of his employment. Hunter herself referred to Tursi as "one of [her] officers." Hunter Dep. at 30, and although Tursi stated in his affidavit that Hunter was not his direct supervisor, Tursi Aff. ¶ 4, his account of the May 2, 2007 incident does suggest that Hunter had the authority to direct his conduct with respect to Harris. It also seems that Tursi's alleged statement concerns a matter within the scope of his employment under Rule 801(d)(2)'s liberal standard. *See Robinson v. Resorts Int'l, Inc.*, 1997 WL 803758, at *3-4 (E.D.N.Y. 1997) (contrasting New York state rule on admissibility of agent's statement against employer with more liberal federal rule); *see generally Pappas v. Middle Earth Condo. Assoc.*, 963 F.2d 534 (2d Cir. 1992).

Accordingly, since the Court cannot conclude on the present record that Hunter's account of Tursi's statement is inadmissible hearsay, the Court declines to grant summary judgment on the defamation claim.

### ii. *Special Damages*

Hunter's remaining argument for summary judgment targets the fifth element of a defamation claim, which requires that "the statement was slander per se or caused special damages." *Baez v. JetBlue Airways*, 745 F. Supp. 2d at 225. Hunter argues that "even assuming

that the statements Plaintiff attributes to Lt. Hunter are defamatory, Plaintiff's defamation claim must be dismissed because she cannot establish that . . . such statements cause[d] Plaintiff special damages." Hunter Mem. at 13; Hunter Opp. to Objs. at 6-7.

This argument also fails.  To state a claim for defamation, a plaintiff need not demonstrate special damages if the alleged statement was slander per se. *Albert v. Loksen*, 239 F.3d at 279.  It is well-settled that a statement that "tend[s] to injure another in his or her trade, business, or profession" constitutes slander per se. *See id.*; *Celle v. Filipino Reporter Enters., Inv.*, 209 F.3d 163, 179-80 (2d Cir. 2000); *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).  The Court has no trouble concluding that the alleged statement—that Harris was a security threat to the courthouse—is the sort that would tend to injure an attorney.  Being labeled a security threat suggests a lack of professionalism, defective moral character, and, worse still, dangerousness.  It also indicates that Harris would not be competent to represent clients since she would not be allowed to enter the courthouse.  The statement is therefore defamatory per se, and Harris need not show special damages. *Celle*, 209 F.3d at 179 ("Even where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages.").

### III.     DA Defendant's Motion for Summary Judgment

Harris's amended complaint asserts eight claims against the individual DA defendants, as well as several claims against the Queens DA. *See* D.E. # 17.  The Magistrate Judge recommended summary judgment for all claims except Harris's First Amendment retaliation claim.

A. *First Amendment Retaliation Claim*

Harris's First Amendment retaliation claim alleges that she was terminated for her statements at work and to the press about the incidence of tuberculosis at the Queens DA. D.E. # 17 ¶¶ 5-21. The Magistrate Judge recommended denial of summary judgment. The DA Defendants have filed objections, so the Court's review is *de novo*.

"To survive a motion for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence which shows (1) that the speech at issue was protected, (2) that [she] suffered an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse employment action." *Cotarelo v. Village of Sleepy Hollow P.D.*, 460 F.3d 247, 251 (2d Cir. 2006) (internal quotation marks omitted). "Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of protected conduct." *Id.* (internal quotation marks omitted).

i. *Harris's Protected Speech*

The First Amendment protects a government employee's speech only when she speaks "as a citizen upon matters of public concern . . . ." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Accordingly, the First Amendment does not protect speech made "pursuant to . . . official duties," *id.* at 421, or speech made "as an employee upon matters only of personal interest." *Connick v. Myers*, 461 U.S. 138, 147 (1983). A matter is of public concern if it "relat[es] to any matter of political, social, or other concern to the community." *Id.* at 146. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147.

Harris claims that her termination was in retaliation for speech made on two separate dates. The first is April 20, 2007, four days prior to her termination.  According to Harris's deposition testimony, that day rumors of a list of employees who had tested positive for tuberculosis had been circulating "like wildfire" around the office. Harris Dep. at 44.  This list included her office mate. *Id.* at 44-45.  Harris claims that she told supervisors Pamela Byer and Joan Ritter that she was afraid to work in the same room as her office mate. *Id.* at 43, 49.

The second date is April 23, 2007, one day before Harris was terminated.  On that date, Harris claims that she called the press. *Id.* at 40.  She alleges that she told at least "the New York Times, the Daily News, and the Post" "that [the DA's Office was] lying to the prosecutors about people having chest x-rays, telling people to get back to work amongst infected people that they knew were infected." *Id.* at 58.  Whether the DA's Office ever became aware of these calls to the press is disputed.

The Magistrate Judge held that Harris's calls to the press on April 23, 2007 constituted protected speech but that her complaints on April 20, 2007 did not.  The Court agrees with the Magistrate's finding on the April 23 statements.  The Second Circuit has squarely stated that "safety in the workplace is a matter of public concern." *Munafo v. Metro. Tranp. Auth.*, 285 F.3d 201, 212 (2d Cir. 2002).  Harris has not objected to the Magistrate Judge's finding with respect to the April 20 statements.  Because it is not clear error, the Court adopts that finding.

*ii.  Causation*

To survive summary judgment, a plaintiff must present evidence which shows a "causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Cotarelo*, 460 F.3d at 251.  "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was

close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). For purposes of this inquiry, "it is established that an adverse employment action occurs on the date that a decision was formally reached." *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011).

The Magistrate Judge relied principally on closeness in time in finding that Harris had established causation: "Plaintiff contacted the press on April 23, 2007, was released from her three-year commitment on April 24, 2007, and thereafter terminated by letter April 24, 2007." R & R at 17. She rejected the DA Defendants' contention that the record conclusively demonstrates that the decision to release Harris from her three-year commitment was made on April 18, 2007. *Id.* And, indeed, the evidence in the record suggesting that this is true is equivocal at best. Both John Ryan and Jim Quinn—who apparently made the decision—merely speculated in their depositions that the decision would have "probably" been made the week before, *see* Ryan Dep. at 102; Quinn Dep. at 65. The April 18 was simply Quinn's rough estimate. *See* Quinn Dep. at 65 ("Q: Roughly what date? A: The 17th or the 18th."). The Second Circuit has made clear that "an employer cannot insulate itself from liability at the summary judgment stage simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the protected conduct." *Nagle*, 663 F.3d at 110; *Cioffi v. Averall Park Central Sch. Dist.*, 444 F.3d 158, 163 (2d Cir. 2006) (rejecting employer's contention that "informal consensus" to take adverse action had occurred prior to adverse action).

The DA Defendants' first objection appears to renew the argument that the decision to release Harris from her three-year commitment was made on April 18th, prior to any protected speech. DA Defendants' Objs. at 3. But they do nothing to compensate for the dearth of reliable evidence that Wednesday, April 18th was indeed the day. A reasonable jury might find it more

than a curious coincidence that the decision was allegedly made two days before the office became aware of the incidence of tuberculosis, and a week before Harris engaged in protected speech.  And whether the DA Defendants' explanation for this coincidence—that Harris was not going to be promoted with the rest of her class—is credible is another question properly submitted to a factfinder.

The DA Defendants also object to the Magistrate Judge's statement that the record "does not support the DA defendants' contention that plaintiff's evaluations were so poor that she was on the brink of losing her position." R & R at 18.  They argue that Harris's performance evaluations were at least bad enough to justify releasing her from her three-year commitment. DA Defendants Objs. at 4-5.  They never planned to terminate Harris on April 24, they argue, but decided to take this additional step as a result of Harris's belligerent conduct at the meeting releasing her from her three-year commitment.  *Id.*  They claim that Harris's "blatant insubordination at the meeting and her subsequent refusal to return to work were intervening causal events." *Id.*

The Court agrees with the Magistrate Judge's finding that the evaluations are inconclusive. This is because the record as a whole contains conflicting statements as to Harris's competence as an attorney and work at the Queens DA. *See* Ritter Dep. at 53-63; Ramotar Aff.; Rupnarine Aff.; Yagudaev Aff.  Moreover, as the DA Defendants point out, these evaluations were issued well before the protected speech, and thus well before even an April 18th decision.  Whether the DA Defendants' explanation for selecting a seemingly arbitrary Wednesday months after Harris's last evaluation is credible is not appropriate for resolution on a summary judgment motion.  And lastly, termination is not the only "adverse employment action" that suffices to establish a prima facie case of retaliation.  As explained *infra* Section III.A.iii, Harris claims that

the DA Defendants demanded her resignation at the April 24 meeting—surely adverse employment action—before her alleged insubordination. Harris's conduct at the meeting could not, of course, break the causal chain between her protected speech and the pre-insubordination action.

Accordingly, the Court finds that genuine issues of material fact exist concerning the causal connection between Harris's protected speech and the adverse employment action taken by the DA Defendants.

### iii. Whether Adverse Action Would Have Been Taken Anyway

As noted above, the DA Defendants could still prevail on summary judgment if they demonstrate that the adverse action would have been taken absent the protected speech. *Cotarelo*, 460 F.3d at 251; *Nagle*, 663 F.3d at 111. The Magistrate Judge held that there were genuine issues of fact as to whether Harris would have been terminated, as opposed to a lesser sanction, had she not engaged in the protected speech. R & R at 20. She noted that Harris was not fired on the spot at the April 24 meeting, but rather was told to return to work and then later fired. *Id.* This, she found, might suggest that Harris's behavior at the meeting was used as a pretext for firing her. *Id.*

The DA Defendants object to this finding. They claim that the reason Harris was not fired at the April 24 meeting was because no one at the meeting had the authority to do so. DA Defs. Objs. at 7. They contend that "[a]s soon as Jim Quinn had the opportunity to speak to Chief Assistant District Attorney John Ryan and brief him on what transpired at the meeting, the decision was made to terminate plaintiff's employment with the Queens DA's Office." *Id.* This, they argue, suggests that Harris's behavior was truly the reason for her firing.

The problem with this argument is that the DA Defendants' account of the meeting is disputed.     According to Jim Quinn the purpose of the April 24 meeting was merely to release Harris from her commitment, inform her that she would not be promoted with the rest of her class of DAs, and make clear to her that her future with the Office was not in jeopardy as long as she improved her performance. Quinn Dep. at 68-71.  When they informed her of all this, Harris launched into an angry tirade that culminated with her accusing Joan Ritter of attempting to hit her with her car. *Id.* at 70-71.

Not surprisingly, Harris's account differs:

> I got to his office, and he sat me down.  And he said we want you to resign, your work is substandard, you're a substandard lawyer.  And to which I said, this has, this has nothing to do with my abilities.  You're doing this because of the tuberculosis, because I'm complaining about working in an office with tuberculosis.  And that was pretty much how the meeting went.

> He said to me get back to your office, or resign.  And I said I'm not going to get back to my office, and I'm not going to resign.  And he said – and he ordered again, get back to your office or resign.

> And I said I'm not going to do either of those things.  I said you're just going to have to fire me, because I'm not going to sit in an office with somebody who has possibly contagious tuberculosis.

Harris Dep. at 70-71.  This raises triable issues of fact as to the severity of Harris's conduct at the meeting.  Accepting Harris's version of the events, the Court cannot conclude that she would have been terminated, rather than subjected to a lesser sanction, absent her protected speech.

Moreover, a reasonable juror could find that seeking Harris's resignation and then forcing her to choose between resigning and working in an office in which she feared she would contract tuberculosis was itself "adverse employment action."   "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006).  "In the context of a First Amendment retaliation

claim, . . . retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnick v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). Such actions include "demotion, reduction in pay, and reprimand," and even "lesser actions may also be considered adverse employment actions." *Id.* at 226. A reasonable juror could find that Quinn's demand that Harris resign would "deter a similarly situated individual of ordinary firmness" from engaging in protected speech.

Accordingly, the Court adopts the Magistrate Judge's recommendation as to Harris's First Amendment retaliation claim.

### B.  Substantive Due Process Claims

Harris also asserted violations of her substantive due process rights to work in a tuberculosis-free environment and to practice law. The Magistrate Judge recommended summary judgment on both claims.

As to the first claim, the Magistrate Judge found no liberty interest in a tuberculosis-free workplace. R & R at 21-22. She pointed out that the Supreme Court has expressly declined to recognize due process claims asserting a "governmental employer's duty to provide its employees with a safe working environment." *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). And she easily distinguished the cases cited by Harris, which both concerned the rights of mentally retarded, involuntarily committed individuals. *Id.* Harris has filed objections to these findings, but still has cited no case suggesting a liberty interest in a workplace free of tuberculosis, much less a case clearly establishing the right, which she would have to do to survive a qualified immunity analysis.

As to the second claim, the Magistrate found that even if Harris had been denied access to the courthouse on May 2, 2007 and briefly removed from a courtroom on May 4, 2007 (an allegation the Court has had no need to discuss in this memorandum), this would not itself state a claim for denial of the right to practice her profession. R & R at 22-23. The Magistrate Judge relied upon Supreme Court precedent indicating that a "brief interruption," rather than a "complete prohibition" in "the right to engage in a calling" does not rise to the level of a constitutional violation. *See Conn. v. Gabbert*, 526 U.S. 286, 291-92 (1999). The Court agrees that Harris has stated at most a brief interruption. Harris's objection to this finding is nothing more than a conclusory statement of disagreement.

Accordingly, the Court adopts the Magistrate Judge's recommendations on Harris's substantive due process claims.

### C.  Other Claims Against Individual DA Defendants

Harris remaining claims against the individual DA Defendants alleged denial of access to the court, unreasonable search and seizure, conspiracy, defamation, tortious interference with contract, and intentional infliction of emotional distress. The Magistrate Judge recommended summary judgment on all of these claims.

Harris has not objected to the Magistrate's findings as to some of these claims. As to others, she states only that she "renews the objection about the court's failure to search the record," presumably referring to her objections regarding her denial of access to the court claim against Hunter. Where a party does not object or "makes only conclusory or general objections, . . . the Court reviews the Report and Recommendation only for clear error." *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 366 (S.D.N.Y. 2007). Finding no clear error in the Magistrate Judge's

analysis, the Court adopts the recommendation that these remaining claims against the individual DA Defendants be dismissed.

### D. Claims Against the Queens District Attorney's Office

Harris's Amended Complaint arguably asserted claims against the Queens District Attorney's Office. The Magistrate Judge recommended dismissal of any such claim because the Queens DA is not a suable entity. R & R at 35. Harris has filed no objections, so the Court's review the Magistrate's recommendation for clear error. Finding none, the Court adopts the recommendation that summary judgment be granted as to any claims against the Queens District Attorney's Office.

## CONCLUSION

For the reasons stated:

Hunter's motion for summary judgment is DENIED.

The DA Defendants motion for summary judgment is DENIED as to the First Amendment retaliation claim and GRANTED as to all other claims.

SO ORDERED.

Dated:  March 12, 2012
      Brooklyn, N.Y.

                                              _____
                                                  /s/
                                             Carol Bagley Amon
                                             Chief United States District Judge